# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BERT GIBBONS, on behalf of himself and all others similarly situated, | : |
| | : |
| *Plaintiff,* | : **Case No.** ___22-1442___ |
| | : |
| v. | : **CLASS ACTION COMPLAINT** |
| | : |
| KONINKLIJKE PHILIPS N.V., PHILIPS | : **DEMAND FOR JURY TRIAL** |
| NORTH AMERICA LLC, PHILIPS | : |
| HOLDING USA INC., PHILIPS RS | : |
| NORTH AMERICA LLC, and PHILIPS | : |
| RS NORTH AMERICA HOLDING | : |
| CORPORATION, | : |
| | : |
| *Defendants.* | : |

Plaintiff Bert Gibbons, individually and on behalf of all others similarly situated, through the undersigned counsel, alleges as follows.

## I.   <u>NATURE OF THE ACTION</u>

1.      Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational company that is the global head of the "Philips" enterprise, which bills itself as "a diverse team made up of some 80,000 individuals across over 100 countries, all with different backgrounds, perspectives and experiences."[1] Royal Philips controls and oversees all aspects of the Philips businesses around the world, going to great lengths to ensure there is a unity of purpose and vision, consistent execution of company procedures, policies, and goals, and, importantly, maintenance and protection of the valuable "Philips" brand. Defendants Philips North America LLC ("Philips NA"), Philips Holding USA Inc. ("Philips USA"), Philips RS North America LLC ("Philips RS"), and Philips RS North America Holding Corporation ("Philips RS Holding") are essential parts of the Philips family that, along with other Philips' entities, engaged in the wrongful conduct at issue in this litigation. These Defendants are referred to collectively herein as "Philips" or the "Philips Defendants." At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and references to "Philips" refer to each Philips Defendant individually and collectively.

2.      Royal Philips boasts on its website, www.philips.com[2]: "Over the past decade we have transformed into a focused leader in health technology…. At Philips, our purpose is to

---

[1] *See generally*, Philips website, available at: https://www.philips.com/a-w/about.html (last accessed Oct. 3, 2022).

[2] The landing (*i.e.*, opening) page for Royal Philips' website contains a copyright for Royal Philips. *See* https://www.philips.com/global ("© Koninklijke Philips N.V., 2004 - 2022. All rights reserved.") (last accessed Oct. 3, 2022).  When accessing the Royal Philips website from the

improve people's health and well-being through meaningful innovation."[3] As part of that business, Philips manufactures and sells certain lines of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. The primary function of these devices is to blow air into patients' airways. CPAP and BiPAP machines are intended for use during sleep while ventilators are used continuously when needed.

3.      Because these machines are used during sleep, Philips designed them to include polyester-based polyurethane ("PE-PUR") foam intended to reduce noise emitted from the motors in the devices. However, it is well-known, and Philips knew for many years, that PE-PUR foam, among other things, is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. This can result in degradation of the foam and off-gassing of volatile organic compounds ("VOCs").

4.      On June 14, 2021, Philips, through multiple of its entities, including Royal Philips and Philips RS, announced a recall of approximately 11 million of its CPAP and BiPAP machines and ventilators in the United States that were manufactured from 2008 until the date of the recall (the "Recall"). Each of these recalled products (individually referred to herein as a "Recalled Device," or collectively, as the "Recalled Devices") are defective because they contain PE-PUR foam.

United States, users are automatically redirected to https://www.usa.philips.com/ (last accessed Oct. 3, 2022). The redirected page also contains a copyright for Royal Philips. *See* https://www.usa.philips.com/ ("© Koninklijke Philips N.V., 2004 - 2022. All rights reserved.") (last accessed Oct. 3, 2022).

[3] Philips website, available at: https://www.philips.com/a-w/about.html (last accessed Oct. 3, 2022).

1.      The Recalled Devices are:

- E30

- DreamStation ASV

- DreamStation ST, AVAPS

- SystemOne ASV4

- C Series ASV, S/T, AVAPs

- OmniLab Advanced Plus

- SystemOne (Q Series)

- DreamStation CPAP, Auto CPAP, BiPAP

- DreamStation Go CPAP, APAP

- Dorma 400, 500 CPAP

- REMStar SE Auto CPAP

- Trilogy 100 and 200

- Garbin Plus, Aeris, LifeVent

- A-Series BiPAP Hybrid A30

- A-Series BiPAP V30 Auto

- A-Series BiPAP A40

- A-Series BiPAP A30

2.      The use of PE-PUR foam in the Recalled Devices is a defect because the foam is susceptible to breaking down into particles which may then be inhaled or ingested by the user, and may emit VOCs that can also be inhaled, resulting in "serious injury, which can be life-threatening,

cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[4]

3.    Philips was aware of problems with the PE-PUR foam in the Recalled Devices dating as far back as 2008 when it began receiving numerous complaints from customers including complaints regarding "contaminants, particles, foam, debris, airway, particulate, airpath, and black."[5] In addition, beginning as far back as 2015, Philips conducted and received multiple test reports and additional data confirming that the Recalled Devices pose serious, indeed life-threatening, health risks to users, but Philips failed to timely disclose that they were defective when manufactured and sold.

4.    Instead of instituting a recall immediately, Philips waited until June 2021 to issue the Recall and notify the public about the dangers of the Recalled Devices, continuing to sell defective devices and leaving users to breath in the toxic fumes and risk serious injury. In its Recall, Philips publicly announced that the PE-PUR foam may break down into particles and be inhaled or ingested, and may emit VOCs that can be inhaled, resulting in "serious injury, which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment"[6] (referred to herein as the "Defect"). Philips stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes,

---

[4] Philips Recall Notices dated June 14, 2021.

[5] *See* FDA 483 Report issued to Philips on November 9, 2021 ("483 Report"), redacted version available at: https://www.fda.gov/media/154244/download (last accessed Oct. 3, 2022), at 12. A 483 Report from the Food and Drug Administration ("FDA") "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts." https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed Oct. 3, 2022).

[6] Philips Recall Notices dated June 14, 2021.

nose respiratory tract, skin), hypersensitivity, nausea, vomiting, toxic and carcinogenic effects."[7] Philips' announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."[8]

5.     In addition, on July 22, 2021, the U.S. Food and Drug Administration ("FDA") confirmed the severity of the issues described in the Recall and classified the Recall as Class I or "the most serious type of recall," meaning use of the Recalled Devices "may cause serious injuries or death."[9]

6.     As noted above, Philips knew about the serious risks caused by the Recalled Devices long before the Recall.

7.     On November 9, 2021, the FDA issued a report detailing the findings of an FDA investigation, findings that demonstrate Philips knew that the PE-PUR foam degraded into hazardous substances.[10] The FDA discovered emails, dating back to October 2015, to Philips from the supplier of the raw foam used to make the PE-PUR foam in the Recalled Devices regarding PE-PUR foam degradation issues.[11] Additionally, the FDA found that, in November 2015, Philips engaged in preventative maintenance on certain Recalled Devices in response to PE-PUR foam degradation issues and complaints, yet failed to conduct any "further investigation, health hazard

---

[7] *Id*.

[8] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information for physicians" (June 14, 2021), available at: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Oct. 3, 2022)

[9] FDA Notice, "Philips Respironics Recalls Certain Continuous and Non-Continuous Ventilators, including CPAP and BiPAP, Due to Risk of Exposure to Debris and Chemicals," available at: https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed Oct. 3, 2022)

[10] *See generally,* 483 Report

[11] *Id*. at 18.

evaluation, risk analysis, or design review" on any of the Recalled Devices that use the same PE-PUR foam.[12] To be sure, the FDA found that "there were at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues related to potential foam degradation and or Volatile Organic Compound (VOC) emissions."[13] This is in addition to the detailed customer complaints that existed as far back as 2008 and the additional data Philips collected in 2015.

8.      Despite knowing about the degradation and off-gassing problems with the PE-PUR foam and the associated health risks for users of the affected devices, Philips failed until many years later to disclose the Defect to consumers, hospitals, institutions, doctors, and suppliers, continuing to sell the defective products and allowing patients to use the defective products. In addition, Defendant Polymer Technologies, Inc. ("PolyTech"), a supplier of PE-PUR foam to Philips, worked with Philips to conceal these key facts from consumers so that both could continue to profit from the sales of these defective devices.

9.      It was only after Philips launched its next generation of CPAP/BiPAP machines (the DreamStation 2 devices), machines that do not contain PE-PUR foam and could serve as a replacement for Recalled Devices, that Philips finally disclosed that its Recalled Devices were defective. That is, on April 26, 2021, Philips announced that its previous generation DreamStation products and other CPAP, BiPAP, and ventilator devices posed serious health risks to users. Philips then waited an additional seven weeks before initiating the Recall of the dangerously defective

---

[12] *Id*. at 2.

[13] *Id*. at 3.

machines in the United States. Shortly thereafter, Philips expanded its recall of defective CPAP, BiPAP, and ventilator devices worldwide.[14]

10.     Because of the increased demand for safe and effective CPAP, BiPAP, and ventilator devices at the time of the Recall, replacement machines were difficult to find and expensive, a situation that was exacerbated by a shortage of microchips for these devices. Thus, many users were forced into a Hobson's choice – continue using their Recalled Devices and expose themselves to risks of serious injury or death, or stop using their breathing devices and risk health consequences from their underlying conditions.

11.     When the Recall was first announced on June 14, 2021, Philips did not offer users of the Recalled Devices any option for a replacement device.

12.     On September 1, 2021, Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States, and initially, Philips estimated that it would take a year to complete the program.[15]

13.     In announcing the repair/replacement program, Royal Philips CEO Frans van Houten acknowledged that patients using Recalled Devices needed a solution and that delayed

---

[14] *See, e.g.,* Philips website, Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand) (stating that a global recall notification was issued on June 14, 2021 and that recalls specific to Australia and New Zealand were issued on July 2, 2021), available at: https://www.philips.com.au/healthcare/e/sleep/communications/src-update (last accessed Oct. 3, 2022).  Other impacted countries include, but are not limited to Australia, Canada, Israel, and Chile. *Id.*

[15] *See* Royal Philips Press Release, "Philips starts repair and/or replacement program of first-generation DreamStation devices in the US and other markets" (Sept. 1, 2021), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210901-philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-in-relation-to-earlier-announced-recall-notification.html (last accessed Oct. 3, 2022); *see also* https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-and-other-markets (last accessed Oct. 3, 2022)

relief for them presented a problem: "We fully recognize that the timeframe for remediation of the affected devices places patients in a difficult situation."[16]

14.     Unfortunately for users of the recalled DreamStation devices, the repair and replacement program was negligently implemented and ineffective. DreamStation customers were not given any specifics as to how the replacement program would work nor were they told when they might receive a replacement device (a significant factor for users who relied on the machines for medical conditions). Nor did Philips provide meaningful guidance to DreamStation customers' treating physicians. In addition, the repair and/or replacement program was limited in that it only impacted DreamStation Recalled Devices and not any other Recalled Device.

15.     Plaintiff paid for Recalled Devices. He would not have purchased the Recalled Devices had he known that the PE-PUR foam in the Recalled Device could expose users to life-threatening injuries or cause serious health problems, rendering the Recalled Device defective and unsafe, and not fit for their intended purpose.

16.     Plaintiff, individually and on behalf of all others similarly situated who purchased the defective Recalled Devices, seeks to recover compensatory and punitive damages from Philips for breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of usability, negligent recall failure to warn, design defect, fraud, unjust enrichment, redhibition, and applicable state consumer protection statutes.

## II.     THE PARTIES

### A.     PLAINTIFF

17.     Plaintiff Bert Gibbons ("Gibbons") is and at all relevant times was a citizen of Delaware and the United States. Plaintiff paid for two Philips Respironics SystemOne devices on

---

[16] *Id.*

or about January 13, 2015 and January 5, 2019, in Delaware.  Plaintiff was unaware of the Defect

at the time of acquisition, and Plaintiff's devices were included in the Recall.  The Recalled

Devices were purchased for personal, family, or household purposes.  Had Plaintiff been aware of

the Defect in Plaintiff's devices, Plaintiff would not have paid for the devices.  Plaintiff seeks full

reimbursement of all out-of-pocket costs associated with acquiring the Recalled Devices and costs

associated with the Recall.  Plaintiff's out-of-pocket costs related to the acquisition of the Recalled

Devices are at least $1,550.

### B.   **DEFENDANTS**

18.   Defendant Royal Philips is a Dutch multinational publicly traded company having

its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The

Netherlands. Royal Philips is the ultimate parent company of the Philips Group of healthcare

technology businesses including Connected Care businesses focusing on Sleep & Respiratory

Care. "The Company, which started as a limited partnership with the name Philips & Co in

Eindhoven, the Netherlands, in 1891, was converted into the company with limited liability N.V.

Philips' Gloeilampenfabrieken on September 11, 1912. The Company's name was changed to

Philips Electronics N.V. on May 6, 1994, and then to Koninklijke Philips Electronics N.V. on

April 1, 1998, and [finally] to Koninklijke Philips N.V. on May 15, 2013."[17] Royal Philips' shares

have been listed on the Amsterdam stock exchange since 1912, have been traded in the United

States since 1962, and have been listed on the New York Stock exchange since 1987.[18] Royal

---

[17] Royal Philips 2017 Annual Report Note all quarterly and annual reports and SEC 20-F filings from 2009 – present can be found at this link, under the 'All Results' tab: https://www.results.philips.com/publications/ar21 (last accessed Oct. 3, 2022).

[18] *Id.*; *see also* Royal Philips 2021 Annual Report, available for download at https://www.results.philips.com/publications/ar21 (last accessed Oct. 3, 2022), at 117.

Philips holds directly or indirectly 100% of its subsidiaries, Philips NA, Philips USA, Philips RS

Holding, and Philips RS.[19] As such, Royal Philips controls Philips NA and Philips RS with respect

to the manufacturing, selling, distributing, and supplying of the Recalled Devices.[20]

19.     Defendant Philips NA is a Delaware company with its principal place of business

at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.[21] Philips NA was "formerly

known as Philips Electronics North America Corporation."[22] Philips NA is a wholly-owned

subsidiary of Royal Philips, managed by Philips USA.[23]

20.     Defendant Philips USA is a Delaware corporation that was incorporated on July 18,

1995, having its principal place of business at 222 Jacobs Street, Floor 3, Cambridge,

Massachusetts 02141.[24] Philips USA is a holding company that is 100% owned, directly or

---

[19] Royal Philips SEC Form 20-F filing, Exhibit 8, List of Subsidiaries, available at: https://www.sec.gov/Archives/edgar/data/313216/000031321622000008/phg-exhibit8.htm (last accessed Oct. 3, 2022). As of its 2019 SEC Form 20-F filing, Exhibit 8, Royal Philips also lists Respironics, Inc. as a wholly-owned subsidiary. However, Respironics, Inc. is no longer listed as a subsidiary on Royal Philips 2020 SEC Form 20-F filing, Exhibit 8, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (last accessed Oct. 3, 2022); rather, Royal Philips lists Philips RS North America LLC as a subsidiary. *Id.*

[20] *See* Royal Philips 2020 SEC filing.

[21] State of Delaware, Dept. of State, Div. of Corporations, Philips North America LLC.

[22] *See* Complaint for Patent Infringement in *Koninklijke Philips N.V., et al. v. Meditek, Inc., et al.*, No. 1:20-cv-01246-UNA, ECF No. 1, (D. Del. Sept. 17, 2020). "Philips Electronics North America Corporation" is listed as a subsidiary of Royal Philips as of its 2016 Annual Report, Exhibit 8, List of Subsidiaries. "Philips North America LLC" is not listed therein. *Id.* However, "Philips North America LLC" is listed as a subsidiary of Royal Philips on the 2017 SEC 20-F filing, Exhibit 8, List of Subsidiaries, available at: https://www.sec.gov/Archives/edgar/data/313216/000119312517050359/d330553d20f.htm (last accessed Oct. 4, 2022).

[23] Corporate Disclosure Statement in *Newsome, Jr., et al. v. Philips North America LLC, Koninklijke Philips N.V., Philips RS North America LLC, Respironics, Inc., et al.*, 4:22-cv-04101-HSG (N.D. Cal. Jul. 13, 2022), ECF No. 2 ("Newsome Corp. Discl. Stmt.").

[24] State of Delaware, Dept. of State, Div. of Corporations, Philips Holding USA Inc.

indirectly, by Royal Philips. Philips USA manages the operations of Royal Philips' various lines of business including Philips RS Holding and through it, Philips RS.[25] Philips USA is also the member/manager of Philips NA.[26]

21. Defendant Philips RS is a Delaware company with its principal place of business at 6501 Living Place, Pittsburgh, Pennsylvania 15206.[27] Philips RS is 100% owned by Philips RS Holding, which in turn, is 100% owned by Philips USA.[28] Philips RS formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008,[29] creating "Philips Respironics."[30] However, "Philips Respironics is a fictitious name that is 100%

---

[25] Newsome Corp. Discl. Stmt.

[26] *Id.*

[27] State of Delaware, Dept. of State, Div. of Corporations, Philips RS North America LLC.

[28] *See* Newsome Corp. Discl. Stmt.; *see also*, *e.g.*, State of Mississippi, Secretary of State, certificate for Philips RS North America LLC (Respironics, Inc.), which lists that it is a "Member" of Philips RS North America Holding Corporation. This certificate also states an "intent to dissolve" with an effective date of "04/05/2017."

[29] Philips announces completion of tender offer to acquire Respironics, WEB WIRE (Mar. 14, 2008), available at: https://www.webwire.com/ViewPressRel.asp?aId=61199 (last accessed Oct. 3, 2022)..

[30] *See History of BiPAP – Respironics and Philips Respironics, cpap.com, last updated Dec. 9, 2021*, available at: https://www.cpap.com/blog/history-bipap-respironics-philips/ (last accessed Oct. 3, 2022); *see also* Philips in $5 billion Respironics deal, REUTERS (Dec. 21, 2007), available at: https://www.reuters.com/article/us-philips/philips-in-5-billion-respironics-deal-idUSL2131786820071221 (last accessed Oct. 3, 2022); *see also* Philips makes $5.1B public offer to acquire Respironics, RELIABLEPLANT, available at: https://www.reliableplant.com/Read/9713/philips-makes-$51b-public-offer-to-acquire-respironics (last accessed Oct. 3, 2022).

owned by Philips RS [N]orth America LLC."[31] In November 2020, shortly before the Recall, Respironics, Inc. was newly registered under the name Philips RS North America, LLC.[32]

22.    Defendant Philips RS Holding is a Delaware corporation that was incorporated on October 31, 2020, having its principal place of business at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by Philips USA.[33] Accordingly, Philips RS Holding is a citizen of Massachusetts and Delaware.

23.    At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and reference to "Philips" refers to each Philips Defendant individually and collectively.

### III.    JURISDICTION AND VENUE

24.    The Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which Plaintiff and some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

---

[31] Newsome Corp. Discl. Stmt.  Yet, Philips Respironics has a dedicated webpage which states: "**About Philips Respironics** – As a global leader in the sleep and respiratory markets, we're passionate about providing solutions that lead to healthier patients, practices, and businesses." *See* http://www.respironics.com/Philips (last accessed Oct. 3, 2022). Royal Philips holds the copyright on this webpage as of "2004 – 2022" with "[a]ll rights reserved." *Id.* The webpage has a link to a "Privacy policy" that is titled "Philips Privacy Notice" that states "the controller of your personal data (as well as the controller's representative in the European Union) is Philips International B.V. *Id.* Philips International B.V. was founded in 1994 and is a wholly-owned subsidiary of Royal Philips. *See Bloomberg* profile for Philips International BV, available at https://www.bloomberg.com/profile/company/1071145D:NA (last accessed Oct. 5. 2022). Philips International B.V. is a wholly-owned subsidiary of Royal Philips. Royal Philips 2021 SEC Form 20-F filing, Exhibit 8, List of Subsidiaries.

[32] State of Delaware Certificate of Conversion (Nov. 9, 2020).

[33] State of Delaware, Dept. of State, Div. of Corporations, Philips RS North America Holding Corporation.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### IV.     FACTUAL ALLEGATIONS

### A.     CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS.

26.     Sleep apnea is a sleeping disorder in which breathing is disturbed during sleep. These disturbances are called "apneas."

27.     According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

28.     Obstructive sleep apnea is the most common type. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This in turn lowers the oxygen level in the blood, which causes the brain briefly to wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and it may be associated with snorting, choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, and can prevent the patient from reaching the deep, restful phases of sleep.

29.     Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing, which can cause waking with shortness of breath or difficulty getting to sleep or staying asleep.

30.     Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea. An image showing how an airway can be blocked as a result of sleep apnea appears below:



31.     CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. The illustration below shows a generic CPAP machine being used by a patient while sleeping.



32.     Another therapy to treat sleep apnea includes use of BiPAP machines, which use two different pressures – one for inhaling and one for exhaling.

33.     Patients customarily place the CPAP or BiPAP machines on a nearby nightstand or shelf. A hose connects the unit to the mask, which is worn over the nose or mouth during sleep. Below is an image of a Philips DreamStation machine on a nightstand.

15



34.     Patients who use CPAP or BiPAP machines typically must use them every time they sleep.

35.     Mechanical ventilators, usually called "ventilators," are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and inserted through the patient's nose or mouth into the trachea on the other end. Patients are typically sedated while on ventilation because it can otherwise cause intense pain. Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. There are also ventilators for home use. The following image from the National Institute of Health shows a typical ventilator and how it works:



## B. THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM.

36.     The basic technology used in CPAP and BiPAP devices was developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who used it to treat dogs with respiratory problems, before the technology was adapted for humans.

37.     Respironics commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its CPAP device in 1989.

38.     These first-generation CPAP and BiPAP devices created a new and commercially viable field of respiratory therapy. The devices, however, were large and noisy, resulting in an "arms-race" between manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and quieter.

39.     The noise level of CPAP and BiPAP devices became a driver of adult consumer preference because loud devices interrupted the peaceful sleep of both the patient and their partner.

40.     To develop the quietest devices on the market with the lowest decibel ratings, some device manufacturers including Philips filled the CPAP, BiPAP, and ventilator devices with sound abating foam to reduce the volume of noise emitted from the devices.

41.     In fact, the alleged relative quiet nature of the DreamStation products with PE-PUR foam factored prominently into Philips' marketing.[34] Philips represents that it extensively studied and measured the amount of sound produced by DreamStation products. Philips even included an infographic indicating DreamStation products are barely louder than a whisper:[35]



42.     Other manufacturers did not utilize foam for sound abatement, instead they utilized silencing technology to abate the sound from the devices.

---

[34]     *See* Philips Respironics DreamStation Brochure, available at: https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf (last accessed Oct. 3, 2022).

[35] *See id.* at 3.

43. Philips manufactures and sells CPAP and BiPAP machines and ventilators, among other products. According to Royal Philips' 2020 Annual Report,[36] Sleep & Respiratory Care ("SRC") constituted 49% of its total sales in its Connected Care line of business,[37] which, in turn, accounted for 28% of Royal Philips' overall sales of about €19.5 billion. Philips has sold millions of CPAP, BiPAP, and ventilator devices in the United States and elsewhere throughout the globe. In 2021, there was "a 23% decline in [Royal Philips'] Connected Care businesses. This was largely due to the Respironics recall…"[38]

44. Philips provides a User Manual with its CPAP, BiPAP, and ventilator devices. Royal Philips owns the copyright to all, or most, of those User Manuals.[39]

45. Philips made the decision to use PE-PUR foam for sound abatement purposes in its CPAP, BiPAP, and ventilator devices. That decision was made for products distributed by Philips' entities throughout the globe including, but not limited to the United States, Australia, Canada, Israel, and Chile.[40]

---

[36] *See* Royal Philips 2020 Annual Report, available at: https://www.results.philips.com/publications/ar20?type=annual-report&origin=2_us_en_5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_mixedtype_cj&utm_source=5250933&utm_medium=affiliate&utm_campaign=cj&cjevent=ec08e4671a4811ed838f01650a82b821&utm_term=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&cjdata=MXxOfDB8WXww (last accessed Oct. 3, 2022).

[37] Prior to 2019, SRC was part of Philips' Personal Health businesses. *See* Royal Philips 2018 Annual Report, available at: https://www.philips.com/c-dam/corporate/about-philips/sustainability/downloads/other/philips-full-annual-report-2018.pdf (last accessed Oct 4, 2022)

[38] Royal Philips 2021 Annual Report, at 28.

[39] *See, e.g.*, Warranty Exemplars: DreamStation; REMstar SE; Trilogy 100.

[40] *See* Royal Philips Q2 2022 Results, available for download at Philips Q2 2022 Quarterly Results | Philips Results (last accessed Oct. 3, 2022), at 33.

46.     Polyurethane is an organic polymer in which urethane groups connect the molecular units. It is usually formed by reacting a diisocyanate or triisocyanate with a polyol. Under certain circumstances, polyurethane may break down into a diisocyanate or triisocyanate.

47.     The two main types of polyurethane are polyester and polyether. Polyester polyurethane has better shock absorption and vibration dampening properties and is commonly used for soundproofing or sound dampening.

48.     It has been known for decades that polyester polyurethane is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. For example, a chapter of a scientific encyclopedia published in 2013 states: "Poly(ester urethanes) were the first generation of PURs used in medical devices but were found unsuitable for long-term implants because of rapid hydrolysis of the polyester soft segment[.]"[41]

49.     Polyether polyurethane, on the other hand, is less prone to hydrolysis. The same scientific encyclopedia chapter notes that polyether polyurethanes "with excellent hydrolytic stability replaced poly(ester urethanes) and have been used in medical devices for the past two decades."[42]

50.     There were readily available alternative designs available to Philips, other than to use PE-PUR foam in CPAP, BiPAP, and ventilator devices for sound abatement. These include, for example, other types of sound abating foam and silencing technologies that do not use foam.

---

[41] Pal Singh Chauhan, N., and Kumari Jangid, N., "Polyurethanes and Silicone Polyurethane Copolymers," Chapter in Encyclopedia of Biomedical Polymers and Polymeric Biomaterials, January 2013, available at: https://www.researchgate.net/publication/236144965_POLYURETHANES_AND_SILICONE_POLYURETHANE_COPOLYMERS (last accessed Oct. 3, 2022).

[42] Id.

20

51.     For example, Philips' principal competitor, ResMed, uses polyether polyurethane foam or silicone-based foam, not PE-PUR foam, for sound dampening.[43]

## C.     PHILIPS SOUGHT CLEARANCES FROM THE FDA TO MARKET ADULTERATED CPAP, BIPAP, AND VENTILATOR DEVICES THAT IT DESIGNED AND MANUFACTURED.

### 1.     Royal Philips Was Directly Involved With Launching And Marketing The Recalled Devices.

52.     Philips designed and manufactured CPAP and BiPAP devices and ventilators, including the Recalled Devices.

53.     From as early as 2009, Royal Philips took a lead role in launching and marketing several of the Recalled Devices. It did so by "back[ing] … launches with the requisite support in advertising and promotion"[44]; issuing press releases that promoted the devices; participating in medical device conferences that took place in the United States and elsewhere; and maintaining a sleepapnea.com website that educated consumers and providers on Philips devices. Royal Philips' public statements are replete with examples of this conduct.

54.     On June 2, 2009, Philips Respironics issued a press release stating, "Royal Philips Electronics (NYSE:PHG, AEX: PHI) today introduced the Trilogy100 portable at-home life-support ventilator."[45] The Trilogy 100 is one of the Recalled Devices. That same June 2, 2009

---

[43] *See* ResMed website – An update from ResMed's CEO, available at: https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Oct. 3, 2022).

[44] Thomson Reuters StreetEvents, Edited Transcript, PHIA.AS – Q1 2017 Koninklike Philips NV Earnings Call (Apr. 24, 2017), at 5, available at: https://www.results.philips.com/publications/q117/downloads/files/en/philips-first-quarter-results-2017-transcript.pdf?v=20170723194740 (last accessed Oct. 3, 2022).

[45] *See* Philips Respironics Press Release, "Philips Respironics, Philips Expands Home Healthcare Commitment with Portable Life-Support Ventilator; Offers Ease of Use, Portability and Versatility for Patient" (June 2, 2009), available at: https://web.archive.org/web/20090827084718/http://www.prnewswire.com/mnr/respironics/38626/ (last accessed Oct. 3, 2022).

press release directed media inquiries to Steve Kelly,[46] who at the time, was serving as the Director of Global Public Relations and Corporate Communications of Philips Healthcare.[47] While in this position, he "[m]anaged all public relations and corporate communications initiatives on behalf of the largest sector of Philips Electronics while coordinating activities with the HQ team in Amsterdam."[48]

55.    On October 13, 2009, Philips Respironics issued a press release stating, "Royal Philips Electronics (NYSE: PHG, AEX: PHI) today introduced the next generation Philips Respironics Sleep Therapy System at Medtrade 2009, the leading conference and expo for the home medical equipment industry."[49] The Sleep Therapy System referred to in press release was the System One 60,[50] one of the Recalled Devices.

56.    On August 29, 2016, Royal Philips issued a press release that, among other things, stated that Royal Philips "will showcase its latest COPD and respiratory solutions at the upcoming European Respiratory Society International Congress (ERS) in London, from September 3-7."[51]

---

[46] *Id.*

[47] *See* LinkedIn Profile for Steve Kelly (Sept. 22, 2022), available at: https://www.linkedin.com/in/stvkly (last accessed Oct. 3, 2022).

[48] *Id.*

[49] Philips Respironics Press Release, "Philips Unveils Intelligent Sleep Apnea Therapy System To Home Healthcare Industry" (Oct. 13, 2009), available at: http://multivu.prnewswire.com/mnr/brunner/40190/ (last accessed Oct. 3, 2022).

[50] *See id.* (offering media images of the System One 60 device and referring to the "breakthrough System One Humidity Control" and "comfort enhance[ing] System One Resistance Control" features).

[51] *See* Royal Philips Press Release, "Philips Raises Awareness for Chronic Obstructive Pulmonary Disease (COPD) with Platinum Sponsorship of Leonard Nimoy Tribute Documentary" (Aug. 29, 2016), available at: https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2016/20160829-COPD-awareness-with-platinum-sponsorship-Leonard-Nimoy-tribute-documentary.html (last accessed Oct. 3, 2022).

57.    On September 1, 2016, Royal Philips issued a press release regarding its promotion of the DreamStation CPAP, one of the Recalled Devices, at an international trade show:

> At this year's Internationale Funkausstellung (IFA) in Berlin, Germany, Royal Philips (NYSE: PHG, AEX: PHIA) today announced a range of new products . . . Key product innovations being showcased at IFA 2016 that support Philips' commitment to helping consumers stay healthy, live well and enjoy life include: . . . The Dream Family, comprised of the DreamWear mask, DreamStation CPAP (Continuous Positive Airway Pressure) device, and DreamMapper patient engagement app. . . .[52]

The September 1, 2016 press release directed media and others interested in obtaining further information to Netherlands-based Elena Calamo Specchia,[53] who at the time, was working in Royal Philips' Amsterdam office as the Royal Philips Spokesperson and Director of the Royal Philips Group Press Office.[54]

58.    Also on September 1, 2016, Royal Philips held a press conference at the IFA trade show,[55] during which Netherlands-based Pieter Nota (who at the time was Royal Philips' CEO of Personal Health Businesses, Chief Marketing Officer, and Member of the Executive Committee and Board of Management)[56] made a presentation promoting the DreamStation as well as other

---

[52] *See* Royal Philips Press Release, "Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016" (Sept. 1, 2016), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2016/20160901-philips-introduces-a-wide-range-of-connected-personal-health-innovations-at-ifa-2016.html (last accessed Oct. 3, 2022).

[53] *Id.*

[54] *See* LinkedIn Profile for Elena Calamo Specchia (Sept. 29, 2022), available at: https://nl.linkedin.com/in/elena-calamo-specchia-b3a17418 (last accessed Oct. 3, 2022).

[55] Royal Philips Press Release, "Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016" (Sept. 1, 2016).

[56] *See* LinkedIn Profile for Pieter Nota, available at: https://de.linkedin.com/in/pieter-nota-5526a235 (last accessed Oct. 3, 2022).

Philips products that were being showcased at IFA.[57] The press conference was live-streamed on Royal Philips' website, www.ifa.philips.com.[58]

59.     On January 5, 2017, Royal Philips issued a press release announcing that "Royal Philips" was showcasing its products, including the DreamStation Go, at the International Consumer Electronics Show (CES) in Las Vegas.[59] The press release quoted Pieter Nota as stating, "In areas such as oral health, mother and child care, sleep and respiratory care, heart health, and home monitoring, Philips is showcasing its ecosystem of connected products and services at CES, once again demonstrating its leadership in the world of digital health."[60] As with the September 1, 2016 press release, Royal Philips' Elena Calamo Specchia was again listed as the media contact.[61]

60.     On January 24, 2017 in a Royal Philips investor call, CEO Frans van Houten remarked on the "success" of Philips' Dream Family of products and was enthusiastic about introduction of the DreamStation Go, one of the Devices at issue here:

> Building on the success of the Philips' integrated Dream Family solution in the United States, Europe and Japan, we recently introduced a Philips DreamStation Go portable CPAP solution. DreamStation Go is a compact and lightweight device designed to provide sleep therapy for travelers with obstructive sleep apnea.[62]

---

[57] *See* TechEvents YouTube video, Philips Press Conference Full at IFA 2016 (Sept. 1, 2016), at 8:28-10:00, https://www.youtube.com/watch?v=ZU5PFn91_oU (last accessed Oct. 3, 2022).

[58] Royal Philips Press Release, "Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016".

[59] Royal Philips Press Release, "Philips Highlights Cloud-Based Innovations at the Forefront of Digital Health During CES" (Jan. 5, 2017), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20170105-philips-highlights-cloud-based-innovations-at-the-forefront-of-digital-health-during-ces.html (last accessed Oct. 3, 2022).

[60] *Id.*

[61] *Id.*

[62] Thomson Reuters StreetEvents, Edited Transcript, PHIA.AS – Q4 2016 Koninklike Philips NV Earnings Call (Jan. 24, 2017), at 5, available at: http://www.philips.com/static/qr/2016/q4/philips-fourth-quarter-results-2016-transcript.pdf (last accessed Oct. 3, 2022).

61.    On March 7, 2017, Royal Philips issued a press release in which "Royal Philips . . . announced the expansion of its Dream Family of products with the new DreamStation Advanced Therapies" products, which consisted of "the DreamStation Advanced Therapies BiPAP autoSV and AVAPS devices,"[63] both of which are Recalled Devices at issue in this litigation.

62.    On April 11, 2017, Royal Philips issued a press release in which "Royal Philips . . . announced the launch of DreamStation Go."[64] Royal Philips' Elena Calamo Specchia was again listed as one of the media contacts on the press release.[65]

63.    On April 24, 2017, in a Royal Philips investor call, Royal Philips CFO, EVP and Member of the Board of Management Abhijit Bhattacharya[66] informed investors that Royal Philips would launch the DreamStation Go and provide financial support for the advertising and promotion of the device:

> As Frans [van Houten] mentioned, in Health & Wellness, we have a solid pipeline of new product introductions . . . We will also launch the Philips DreamStation Go portable CPAP solutions. We will back these launches with the requisite support in advertising and promotion, which will have a dampening effect on the results of Personal Health in the second quarter. However, I hasten to add that we do expect

---

[63] *See* Royal Philips Press Release, "Philips expands its award-winning DreamStation platform to treat patients with most complex sleep and breathing needs" (Mar. 7, 2017), available at: https://www.prnewswire.com/news-releases/philips-expands-its-award-winning-dreamstation-platform-to-treat-patients-with-most-complex-sleep-and-breathing-needs-300418735.html (last accessed Oct. 3, 2022).

[64] *See* Royal Philips Press Release, "Philips Simplifies Travel for Sleep Apnea Patients with New Compact and Connected DreamStation Go Sleep Therapy Device" (Apr. 11, 2017), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20170411-philips-simplifies-travel-for-sleep-apnea-patients-with-new-compact-and-connected-dreamstation-go-sleep-therapy-device.html (last accessed Oct. 3, 2022).

[65] *Id.*

[66] *See* Royal Philips webpage for Abhijit Bhattacharya, available at: https://www.philips.com/a-w/about/executive-committee/abhijit-bhattacharya.html#triggername=close_tab (last accessed Oct. 5, 2022). Mr. Bhattacharya is based in Eindhoven, the Netherlands.

to have continued improvements in operating results for Personal Health.[67]

64.    On September 8, 2017, Royal Philips issued a press release announcing that, "At the European Respiratory Society (ERS) International Congress 2017 in Milan, Italy (September 9-13), Royal Philips (NYSE: PHG, AEX: PHIA), a global leader in health technology, will showcase and announce the global expansion of its suite of cutting-edge connected respiratory and sleep solutions," which included "the brand-new DreamStation Go," and the "DreamStation BiPAP AutoSV and AVAPS solutions."[68]

65.    On November 13, 2017, Royal Philips issued a press release announcing that "Royal Philips" would be showcasing several new medical products, including the DreamStation Go, at the 2017 MEDICA World Forum for Medicine in Düsseldorf, Germany.[69] The press release quoted Frans van Houten as stating that "[t]he intelligent sleep therapy, respiratory care and ultrasound solutions we are showcasing at this year's MEDICA bridge important transitions from healthy living to diagnosis, and clinical treatment to home care and chronic disease management, allowing patients to return home and enjoy the most out of life as quickly as possible."[70] As with

---

[67] Thomson Reuters StreetEvents, Edited Transcript, PHIA.AS – Q1 2017 Koninklike Philips NV Earnings Call (Apr. 24, 2017), at 5 (emphasis added).

[68] *See* Royal Philips Press Release, "Philips showcases expanding connected respiratory and sleep solutions at ERS 2017" (Sept. 8, 2017), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20170908-philips-showcases-expanding-connected-respiratory-and-sleep-solutions-at-ers-2017.html (last accessed Oct. 3, 2022).

[69] *See* Royal Philips Press Release, "Philips innovations at MEDICA 2017 connect people,technology and data across the health continuum" (Nov. 13, 2017), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20171113-philips-innovations-at-medica-2017-connect-people-technology-and-data-across-the-health-continuum.html (last accessed Oct. 3, 2022).

[70] *Id.*

other similar press releases, Royal Philips' Elena Calamo Specchia was listed as the media contact.[71]

66.     On November 14, 2017, Royal Philips issued a press release promoting its involvement in World COPD Day.[72] The press release also promoted the DreamStation Advanced Therapies products and the Trilogy hospital-to-home ventilators.[73] Royal Philips' Elena Calamo Specchia is again listed as the media contact.[74]

67.     On January 29, 2018, Royal Philips issued a press release announcing that "Royal Philips" was participating in the 2018 Arab Health Exhibition and Congress on January 29, 2018 through February 1, 2018, and was showcasing several Philips products, including the DreamStation Go.[75] The press release directed media inquiries to Netherlands-based Joost Maltha,[76] as Royal Philips' Senior Global Press Officer, Director of Communications.[77]

68.     On April 16, 2019, Royal Philips issued a press release announcing that Philips would be promoting "its latest offerings" at the Medtrade show in Las Vegas, Nevada in the Spring

---

[71] *Id.*

[72] *See* Royal Philips Press Release, "Philips launches global education and empowerment effort for World COPD Day" (Nov. 14, 2017), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20171114-philips-launches-global-education-and-empowerment-effort-for-world-copd-day.html (last accessed Oct. 3, 2022).

[73] *Id.*

[74] *Id.*

[75] *See* Royal Philips Press Release, "Philips Breaks Health Technology Boundaries at Arab Health 2018" (Jan. 29, 2018), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2018/20180129-philips-breaks-health-technology-boundaries-at-arab-health-2018.html (last accessed Oct. 3, 2022).

[76] *Id.*

[77] *See* LinkedIn Profile for Joost Maltha (Sept. 29, 2022), available at: https://nl.linkedin.com/in/joostmaltha (last accessed Oct. 3, 2022).

of 2019.[78] Philips featured its "new, patient-focused DreamStation Go Heated Humidifier and DreamWisp" "designed to further enhance effective and efficient care for patients with chronic respiratory and sleep conditions."[79]

69.     In addition, from as early as September 2014 until the present, Royal Philips has maintained the website SleepApnea.com, which educates consumers and providers on sleep apnea and the various treatment devices offered by Philips.[80]

### 2.  Philips Obtained Clearances For the Recalled Devices Without Undergoing The Premarket Approval Process.

70.     Philips obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various CPAP, BIPAP and ventilator devices.

71.     510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

72.     510(k) clearance generally only requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least 90 days prior to the device's introduction on the

---

[78] *See* Royal Philips Press Release, "Philips showcases new opportunities for Home Medical Equipment providers at Medtrade Spring" (Apr. 16, 2019), available at: https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2019/20190416-philips-showcases-new-opportunities-for-home-medical-equipment-providers-at-medtrade-spring.html#:~:text=Philips%20showcases%20new%20opportunities%20for%20Home%20Medical%20Equipment,effective%20care%20options%20for%20HMEs%20and%20their%20patients (last accessed Oct. 3, 2022).

[79] *Id.*

[80] *See* sleepapnea.com landing page, archived on Sept. 28, 2014 at https://web.archive.org/web/20140928073021/http://www.sleepapnea.com/ (last accessed Oct. 3, 2022). The landing page of the website contains a copyright for Royal Philips: "© Koninklijke Philips N.V., 2004 - 2014. All rights reserved.)."

28

market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

73. Philips utilized the 510(k) process to receive clearances for each of its Recalled Devices except the E30 ventilator which was marketed under an Emergency Use Authorization (EUA).

74. With respect to the EUA for the E30 ventilator, on March 24, 2020, in response to "concerns relating to insufficient supply and availability of FDA-cleared ventilators for use in healthcare settings to treat patients during the Coronavirus Disease 2019 (COVID-19) pandemic[,]"[81] the FDA issued an umbrella EUA of ventilators and related equipment. On April 8, 2020, this EUA was extended to the E30 ventilator.[82] A device may be authorized under this umbrella EUA if it "may be effective" in diagnosing, treating, or preventing COVID-19[83]; and according to the FDA, "[t]he 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals."

75. With respect to the 510(k) process for each of the other Recalled Devices, Philips included data, testing, and biocompatibility results along with its applications to claim substantial equivalence to a predicate device.

76. Upon reviewing the submissions, the FDA determined Philips' devices were substantially equivalent to a predicate device.

---

[81]*See* Food and Drug Administration, Ventilators and Ventilator Accessories EUAs, available at: https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/ventilators-and-ventilator-accessories-euas#:~:text=Umbrella%20EUA%20for%20Ventilators%20and,during%20the%20COVID%2D19%20pandemic (last accessed Oct. 3, 2022).

[82] *Id.*

[83] *See* Food and Drug Administration, Emergency Use Authorization Letter (Mar. 24, 2020), available at: https://www.fda.gov/media/136423/download (last accessed Oct. 3, 2022).

77.     After the devices were sold, Philips had a duty to find, investigate, and report adverse events to the FDA. For example, 21 C.F.R. part 803 requires Philips to conduct a thorough investigation of each event. This duty is triggered when Philips becomes aware of information from any source that reasonably suggests that its device (1) may have caused or contributed to a death or serious injury, or (2) has malfunctioned, and, this device or a similar device it markets, is likely to cause or contribute to a death or serious injury, if the malfunction were to recur. 21 C.F.R. § 803.50.

78.     Additionally, as a manufacturer, Philips has unique knowledge concerning the frequency, severity and predictability of the complications and risks associated with its devices. Accordingly, Philips has post-market responsibility under the FDA Regulations related to complaint handling, investigation and reporting to the FDA, including but not limited to:

a.  21 C.F.R. § 803.10 (for example, § 803.10(c) requires adverse events to be reported by a manufacturer in set time frames from 5 to 30 days when the event becomes known);

b.  21 C.F.R. § 803.17 ("Medical device manufacturers must develop and implement standardized medical device reporting procedures so that timely evaluation of events and communication of findings can occur.");

c.  21 C.F.R. § 803.18 (§ 803.18(d)(1) requires a device distributor to maintain complaint files and records, including any written, electronic or oral communication, either received or generated by the distributor, that alleges deficiencies related to the identity (e.g., labeling), quality, durability, reliability, safety, effectiveness, or performance of a device.);

d.  21 C.F.R. § 803.20 ("Manufacturers must timely communicate a reportable event. Any information, including professional, scientific, or medical facts, observations, or opinions, may reasonably suggest that a device has caused or may have caused or contributed to an MDR reportable event. An MDR reportable event is a death, a serious injury, or, if you are a manufacturer or importer, a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.");

e.  21 C.F.R. § 803.3 ("If you are a manufacturer, you are considered to have become aware of an event when any of your employees becomes aware of a

reportable event that is required to be reported within 30 calendar days or that is required to be reported within 5 work days because we had requested reports in accordance with 803.53(b). You are also considered to have become aware of an event when any of your employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.");

f. 21 C.F.R. § 803.50 ((a) "If you are a manufacturer, you must report to the FDA information required by 803.52 in accordance with the requirements of 803.12(a), no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market: (1) May have caused or contributed to a death or serious injury or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." Subsection (b) defines information reasonably known to a manufacturer to include: "[a]ny information that you can obtain by contacting a user facility, importer, or other initial reporter; . . . [a]ny information in your possession; or . . . [a]ny information that you can obtain by analysis, testing, or other evaluation of the device." Section 803.50 continues: "(2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. (3) You are also responsible for conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under 803.56 in accordance with the requirements of 803.12(a).");

g. 21 C.F.R. § 803.52 (detailed individual and device information must be submitted for each adverse event);

h. 21 C.F.R. § 803.53 (information regarding detailed individual and device information must be submitted in a timely manner when remedial action may be required);

i. 21 C.F.R. § 803.56 (supplemental reporting must be done if additional information is learned that became known after the initial report was submitted);

j. 21 C.F.R. § 814.82(a)(2) (manufacturer has a duty of "[c]ontinuing evaluation and periodic reporting on the safety, effectiveness, and reliability of the device

31

for its intended use. FDA will state in the PMA approval order the reason or purpose for such requirement and the number of patients to be evaluated and the reports required to be submitted.");

k.  21 C.F.R. § 814.84 (the periodic reports required by law must contain the reports in the scientific literature that pertain to the device which are known or should be known to the manufacturer); and

l.  21 C.F.R. § 820.198 ("Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (1) Whether the device failed to meet specifications; (2) Whether the device was being used for treatment or diagnosis; and (3) The relationship, if any, of the device to the reported incident or adverse event").

79.    In addition, there are state law duties to monitor, investigate, evaluate and timely report injuries and other important safety information regarding a medical device, which Philips violated when it failed to: monitor, investigate and report PE-PUR foam degradation risk and incidents; take the necessary steps to continually evaluate the safety, effectiveness and reliability of its Recalled Devices; and take necessary steps to warn, strengthen its warnings, and take other measures to assure compliance with its obligations.

### 3.    The Recalled Devices Are "Adulterated" According To The FDA's Findings And, Therefore, They Are Worthless.

80.    The FDA determined that the Recalled Devices failed to comply with "current good manufacturing practice" requirements ("GMPs") codified in FDA regulations.[84] Devices that are not manufactured in compliance with FDA's GMPs "shall be deemed adulterated." 21 U.S.C. § 351(h); *see id.* § 360j(f)(1) (authorizing FDA to issue regulations prescribing GMP requirements).

---

[84] *See* Food and Drug Administration 518(b) Notice Letter to Philips Respironics, May 2, 2022 ("518(b) Notice"), available for download at https://www.fda.gov/media/158129/download, at 6 (citing 21 CFR §820.100).

Title 21 of the U.S. Code prohibits the sale, receipt, or delivery of "adulterated" devices. *See* 21 U.S.C. § 331(a) & (c). Accordingly, the Recalled Devices were adulterated and prohibited for sale, receipt, or delivery.

81. Specifically, the FDA determined that Philips' manufacture of the Recalled Devices failed to comply with the GMPs imposed by FDA's "Quality System Regulation" ("QSR") "since at least November 2015."[85] The QSR required Philips to "establish and maintain procedures for implementing corrective and preventative action" for the Recalled Devices that satisfy seven criteria. 21 C.F.R. § 820.100(a)(1)-(7).

82. In addition to the FDA's determination that the Recalled Devices violated the QSR requirements codified at 21 C.F.R. § 820.100, the Recalled Devices were "adulterated," and their sale prohibited, under 21 U.S.C. § 351(c), which bans a device as adulterated if its "purity or quality falls below[] that which it purports or is represented to possess." 21 U.S.C. § 351(c).

83. There is no dispute that the Recalled Devices "fall[] below" their represented quality. *See* 21 U.S.C. § 351(c). Philips sold the Recalled Devices as, *inter alia*, "clinically proven" treatments for sleep disorders.[86] But in its Recall and elsewhere, Philips admits that their use may cause "serious injury which can be life-threatening, cause permanent impairment, and/or require

---

[85] *Id.* at 6, 10.

[86] *See, e.g.,* Philips US Product page, DreamStation BiPAP autoSV ("DreamStation BiPAP autoSV['s] . . . clinically proven algorithm provides support when needed."), available at: https://www.usa.philips.com/healthcare/product/HCAHX900T15/dreamstation-bipap-autosv-servo-ventilation-system (last accessed Oct. 4, 2022); Philips US DreamStation Go - Features ("DreamStation Go includes the same clinically-proven Flex pressure-relief technologies, therapy algorithms and event detection found in our DreamStation and System One PAP therapy devices."), available at https://www.usa.philips.com/healthcare/product/HCEUG502S15/dreamstation-go-portable-pap-therapy-system#features (last accessed Oct. 5, 2022).

medical intervention to preclude permanent impairment."[87] As such, the Recalled Devices were undisputedly adulterated and unsalable pursuant to 21 U.S.C. § 351(c).

84.     Further, the FDA's investigation revealed that Philips' incorporation of PE-PUR foam in the Recalled Devices at all times violated other subdivisions of the QSR, minimally including:

a.  21 C.F.R. § 820.70(h) (requiring manufacturers to "establish and maintain procedures for the use and removal of" manufacturing materials that "could reasonably be expected to have an adverse effect on product quality");

b.  21 C.F.R. § 820.30(c) (requiring manufacturers to "establish and maintain procedures to ensure that the design requirements relating to a device are appropriate and address the intended use of the device"); and

c.  21 C.F.R. § 820.30(g) (requiring manufacturers to "establish and maintain procedures for validating the device design," including "that devices conform to defined user needs and intended uses").

85.     Philips' failure to comply with the FDA's QSR (and, concomitantly the FDA's GMPs) establishes that the Recalled Devices were "adulterated" and should not have been sold in the first instance. Each violation of the QSR furnishes an independent basis to find the Recalled Devices were "adulterated" within the meaning of Title 21. *See* 21 U.S.C. §§ 351(h) & 360j(f)(1).

86.     Adulterated devices that put users at risk of life-threatening injuries, like the Recalled Devices here, are worthless because they can neither be demanded nor supplied: they cannot be legally sold, received, or delivered in interstate commerce. 21 U.S.C. § 331(a) & (c).

## D.     PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO USERS OF PHILIPS DEVICES.

87.     Philips has belatedly revealed that the PE-PUR foam in the Recalled Devices degrades and exposes patients to toxic particles and gases. Such exposure has harmed hundreds of

---

[87] Philips Recall Notices dated June 14, 2021.

thousands of patients across the United States who used the Recalled Devices.

88. Patients who used Recalled Devices are now at risk of developing cancer and other serious health conditions in the future.

89. On the same day as the Recall – June 14, 2021 – Philips released an announcement entitled "Clinical information for physicians." In this announcement, Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[88] The PE-PUR foam is black, and when it breaks down, it can release black particles.[89] The announcement stated that the foam breakdown "may lead to patient harm and impact clinical care,"[90] explaining:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, ***it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.***[91]

90. The announcement mentioned two types of hazards from the foam in the devices: dangers from foam degradation and dangers from release of VOCs.

91. First, the announcement described dangers arising from foam degradation exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be

---

[88] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information for physicians (June 14, 2021).

[89] *Id.*

[90] *Id.*

[91] *Id.* (emphasis added).

exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.

The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:

- Toluene Diamine

- Toluene Diisocyanate

- Diethylene glycol.[92]

92.    The inhalation of extremely fine particulates, even non-toxic particulates, can lead to adverse health outcomes. The Environmental Protection Agency ("EPA") notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases."[93]

93.    On July 8, 2021, Philips released an update to a global supplemental clinical information document that contained results based on its own testing of the affected devices, stating that: "According to analysis performed by Philips, the majority of particulates are of a size (>8 μm) . . . Smaller particulates (<1-3 μm) are capable of diffusing into deep lung tissue and deposit into the alveoli. During testing performed by an outside laboratory on lab degraded foam, the smallest particulate size identified was 2.69 μm."[94]

94.    The purity of the air coming from a breathing device to a patient is highly important

---

[92] *Id.*

[93] *See* Health and Environmental Effects of Particulate Matter (PM) | US EPA (last accessed Oct. 3, 2022).

[94] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update, Clinical information" (July 8, 2021), available at: philips-global-supplemental-clinical-information-document.pdf (last accessed Oct. 3, 2022).

and material. Indeed, Philips advertises the filtration systems in its devices, for example, noting them on a diagram in its DreamStation Family Brochure.[95] Philips' filtration system, however, does not filter out the particles described above.

95.     In addition to the hazards created by the inhalation of extremely fine particulates, Philips has admitted that the particulates created via PE-PUR foam degradation contain toxic compounds such as toluene diamine, toluene diisocyanate, and diethylene glycol.[96] As discussed in more detail below, these compounds are toxic and/or carcinogenic when inhaled or ingested.

96.     Philips concluded in its Health Hazard Evaluations ("HHEs") regarding the PE-PUR foam degradation risk that "[b]ased on the cytotoxicity and genotoxicity results and toxicological risk assessment, combined with [the] conclusion that particles are likely to reach the upper airway and potentially the lower respiratory track [sic], a reasonable worst-case estimate for the general and higher risk (e.g., patient populations with preexisting conditions or comorbidities) patient populations is a severity level 3 (Crucial) for both short/intermediate and long term exposure."[97]

97.     Philips' HHEs note that the harm due to foam degradation "'may not be immediately recognizable and may not be something that the customer would/could report,' adding that certain harms 'may not be easily linked to the hazardous situation or device use in general'— and that in the case of genetic mutations in particular, 'a presumed lag time from exposure to harm

---

[95]    *See* Philips Respironics DreamStation Family Brochure, available at: https://www.documents.philips.com/assets/20180205/15ef65ad106d4ddc88fca87e0134dc60.pdf?_gl=1*1l6jo9f*_ga*MTM1OTI5NDM5Ny4xNjIzODE3MzMz*_ga_2NMXNNS6LE*MTYyNjkxMDEyNC4yMi4xLjE2MjY5MTQyNTkuMjc.&_ga=2.220564312.1106063144.1626914226-1359294397.1623817333 (last accessed Oct. 3, 2022).

[96] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update, Clinical nformation" (July 8, 2021).

[97] 518 (b) Notice, at 3-4.

37

development may make it difficult for patients to attribute their individual harm to the device usage.'"[98]

98.     The second hazard is the release of VOCs, that is, toxic and carcinogenic chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl).[99]

99.     In addition to these two compounds, Philips has also found high levels of formaldehyde, a known carcinogen, in analyses of the Recalled Devices. Collectively, these compounds released by PE-PUR foam—formaldehyde, toluene diamine, toluene diisocyanate, diethylene glycol, dimethyl diazine, and phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)— are referred to herein as the "Foam Toxins."

100.     Philips admitted that the risks of these VOCs include: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and

---

[98] *Id.* at 5.

[99] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information for physicians" (June 14, 2021).

carcinogenic effects," as well as "adverse effects to other organs" such as kidney and liver.[100]

101.    It is beyond reasonable dispute that patients using the Recalled Devices were exposed to harmful particulates and the toxic Foam Toxins. As detailed below, each of the Foam Toxins poses a serious health hazard to users of the Recalled Devices.

### 1. <u>Formaldehyde Is A Known Carcinogen.</u>

102.    Although Philips has not publicly acknowledged that formaldehyde is used in the manufacturing process for PE-PUR foam or is a byproduct of PE-PUR foam degradation, Philips' internal testing (dated May 22, 2019) reported the presence of formaldehyde in analyses of its DreamStation 1 devices, finding "tolerable limits of the Formaldehyde compound were exceeded during initial operation, as well as at the [redacted]."[101]

103.    Formaldehyde has been classified as carcinogenic to humans (Group 1)[102] by the International Agency for Research on Cancer ("IARC") since 2006.[103] Governmental authorities in the United States have reached similar conclusions: the National Toxicology Program in the United State Department of Health and Human Services ("NTP") has classified formaldehyde as

---

[100] *Id.*

[101] *See* 483 Report, at 6.

[102] The IARC, an agency of the World Health Organization, groups carcinogenic and potentially carcinogenic substances into five categories: Group 1, carcinogenic to humans; Group 2A, probably carcinogenic to humans; Group 2B, possibly carcinogenic to humans; Group 3, not classifiable as to its carcinogeneity to humans; and Group 4, probably not carcinogenic to humans. International Agency for Research on Cancer, *Agents Classified by the IARC Monographs, Volumes 1–129*, IARC (last updated Jul. 1, 2022), available at: http://monographs.iarc.fr/ENG/Classification/index.php (last accessed Oct. 3, 2022). The EPA uses an equivalent grouping system of five categories (Groups A-E). *See Risk Assessment for Carcinogenic Effects*, EPA.com, available at: https://www.epa.gov/fera/risk-assessment-carcinogenic-effects (last accessed Oct. 3, 2022).

[103] *Formaldehyde*, IARC Monograph – 100F, IARC, available at: https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono100F-29.pdf (last accessed Oct. 3, 2022).

a known human carcinogen since 2011[104]; and the EPA has considered formaldehyde to be a probable human carcinogen (Group B1) since 1989.[105]

104.     There is extensive research, including dozens of human epidemiological studies, showing an association between formaldehyde exposure and numerous forms of cancer, including: nasopharyngeal cancer; sinonasal cancer; leukemia; lung cancer; lymphohematopoietic cancers (other than leukemia); nasal, oral, and throat cancers (other than nasopharyngeal and sinonasal cancers); brain cancer; hepatic cancer; esophageal cancer; thyroid cancer; and pancreatic cancer.[106] Additionally, exposure to formaldehyde appears to have a strong causal relationship to asthma.[107]

### 2.     Toluene Diisocyanate Is A Likely Carcinogen.

105.     Toluene diisocyanates ("TDIs") are used primarily to manufacture flexible polyurethane foams such as PE-PUR foam. Philips has recognized that PE-PUR foam releases TDIs as it degrades.[108]

---

[104]     *Formaldehyde*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf (last accessed Oct. 3, 2022).

[105]     *See* https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet#r1 (last accessed Oct. 3, 2022).

[106]     *See, e.g.*, *Formaldehyde*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf; *1910.1048 App C - Medical surveillance – Formaldehyde*, OSHA.com, available at: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1048AppC (last accessed Oct. 3, 2022).

[107]     *See, e.g.*, *1910.1048 App C - Medical surveillance – Formaldehyde*, OSHA.com, available at: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1048AppC (last accessed Oct. 3, 2022).

[108]     *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information for physicians" (June 14, 2021) ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include … toluene diisocyanate isomers (TDI)").

106. TDI is classified as possibly carcinogenic to humans (Group 2B) by IARC.[109] The United States Center for Disease Control ("CDC"), Occupational Safety and Health Administration ("OSHA"), and National Institute for Occupational Safety and Health ("NIOSH") also regard TDI as a potential human carcinogen based on tumorigenic responses in TDI treated rats and mice.[110] The EPA has taken action under the Toxic Substances Control Act to allow oversight of the use of TDI in consumer products.[111] NTP classifies TDI as "reasonably anticipated to be a human carcinogen" based on sufficient evidence of carcinogenicity from studies in experimental animals.[112] The European Union warns that TDI "is fatal if inhaled."[113]

107. Administration of TDI by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors of the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign tumors of the pancreas (acinar-cell adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels

---

[109] *Toluene diisocyanates*, IARC Monographs Vol. 71, IARC, available for download at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Oct. 3, 2022).

[110] *See, e.g.*, *Toluene diisocyanates*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Oct. 3, 2022); *Current Intelligence Bulletin 53, Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, NIOSH Pub. No. 90-101 (Dec. 1989), available at: https://www.cdc.gov/niosh/docs/90-101/default.html (last accessed Oct. 3, 2022).

[111] *See* https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-toluene-diisocyanate-tdi-and-related#action (last accessed Oct. 3, 2022).

[112] *See* https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Oct. 3, 2022).

[113] https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed Oct. 3, 2022).

(hemangioma and hemangiosarcoma) in female mice.[114] Exposure to TDI also has been documented to cause respiratory irritation, asthma, and lung damage.[115]

### 3. Toluene Diamine Is A Likely Carcinogen.

108.    Philips has recognized that PE-PUR foam releases toluene diamine ("TDA") as it degrades.[116] Additionally, TDA is a hydrolysis product of TDI.

109.    IARC has classified TDA as possibly carcinogenic to humans (Group 2B),[117] and the EPA classifies it as a probable human carcinogen.[118] The European Union has concluded that TDA "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs for many hours each night.[119] The NTP classifies TDA as reasonably anticipated to be a human carcinogen based on animal studies.[120]

110.    Available data on TDA primarily comes from animal studies. These studies

---

[114] See https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf. (last accessed Oct. 3, 2022).

[115] See, e.g., Toluene diisocyanates, IARC Monographs Vol. 71, IARC, available for download at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Oct. 3, 2022).

[116] See Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information" (July 8, 2021) ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include … toluene diamine isomers (TDA)").

[117] See Toluene diisocyanates, IARC Monographs Vol. 71, IARC, available for download at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Oct. 3, 2022).

[118] See Toluene 2,4 diamine, EPA (Jan. 2000), available at: https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last accessed Oct. 3, 2022).

[119] https://ec.europa.eu/health/scientific_committees/consumer_safety/docs/sccs_o_093.pdf (last accessed Oct. 3, 2022), at 5.

[120] 2,4-Diaminotoluene, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/diaminotoluene.pdf (last accessed Oct. 3, 2022).

strongly support an association between TDA and hepatic cancer.[121] There is evidence of a link between TDA exposure and pulmonary fibrosis based on in vitro studies in which human lung fibroblasts were exposed to TDI and TDA.[122] The EPA has determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (*e.g.*, asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.[123] Exposure to TDA can also cause irritation of the skin, nose, and throat, damage to reproductive and neurological systems, eye irritation, dermatitis, ataxia, tachycardia, respiratory depression, stomach gas, hypertension, nausea, vomiting, methemoglobinemia, cyanosis, headache, weakness, exhaustion, dizziness, convulsions, fainting, and coma.[124]

### 4. Diethylene Glycol Is Toxic To Humans.

111.    Diethylene glycol ("DEG") is a widely used solvent. It is a colorless and odorless liquid with a sweetish taste and has often been a contaminant in consumer products, resulting in numerous epidemics of poisoning. DEG is used in the production of polyester polyurethane foam,

---

[121] *Id.*

[122] It is well established that TDI is converted to TDA through hydrolysis (a reaction caused by exposure to water). *See Current Intelligence Bulletin 53, Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, NIOSH Pub. No. 90-101 (Dec. 1989), available at: https://www.cdc.gov/niosh/docs/90-101/default.html (last accessed Oct. 3, 2022). Thus, ingested TDI may react with saliva and/or gastrointestinal fluids and convert to TDA. Additionally, there is evidence that inhaled TDI is converted into TDA by reaction with a substance (gluthathione) present in the lungs. As a result, observed effects ascribed to TDI may be due to unmeasured conversion to TDA after exposure.

[123] *Id.*

[124]    *See Toluene 2,4 diamine*, EPA (Jan. 2000), available at: https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last accessed Oct. 3, 2022).

and Philips has admitted that DEG is a byproduct of PE-PUR foam degradation.[125]

112. DEG has a historical involvement in mass poisonings around the world. Famously, DEG caused the death of 100 people across 15 states in the 1937 Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act ("FDCA") in 1938.[126]

113. DEG is a toxic substance with a mean fatal dose of 1 mL/kg of pure DEG.[127] Ingesting only a small amount may result in gastrointestinal distress and stupor.[128] Exposure may cause irritation of the eyes, skin, and mucous membranes.[129] DEG has also been shown to have damaging toxic, irritating, and inflammatory properties when inhaled.[130]

## 5. Dimethyl Diazine Is A Precursor To A Known Carcinogen.

114. Dimethyl diazene ("DD"), also known as azomethane, is "associated with the production process of the [PE-PUR] foam."[131] Philips has admitted that DD is emitted from PE-

---

[125] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information" (July 8, 2021) ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include diethylene glycol (DEG) ….").

[126] https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf (last accessed Oct. 3, 2022).

[127] L.J. Schep, *et al.*, *Diethylene glycol poisoning*, Clin. Toxicol. 47(6):525-35 (July 2009).

[128] *See* *Ethylene Glycol: Systemic Agent*, NIOSH, available at: https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750031.html#:~:text=Agent%20Characteristics&text=DESCRIPTION%3A%20Ethylene%20glycol%20is%20a,also%20be%20a%20pharmaceutical%20vehicle (last accessed Oct. 3, 2022).

[129] *Id.*

[130] *See, e.g.*, C.J. Hardy, *et al.*, *Twenty-eight-day repeated-dose inhalation exposure of rats to diethylene glycol monoethyl ether*, Fundam. Appl. Toxicol. 38(2):143-7 (Aug. 1997).

[131] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care update: Clinical information" (July 8, 2021) (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)").

PUR foam under normal conditions and possibly also as the result of degradation.[132]

115.    IARC has not yet evaluated the potential carcinogenicity of DD to humans, as there is scant data concerning the effects of DD on humans and animals. However, DD is a member of a family of carcinogenic substances: 1,2-dimethylhydrazine (a Group 2A probable human carcinogen that exhibits hepatotoxic effects along with injuries to other organs in animal experiments[133]) dehydrogenates into DD, which then oxidizes into azoxymethane (a known carcinogen that has not yet been classified by the EPA or IARC). Azoxymethane further oxidizes into methylazoxymethanol, a Group 2B possible human carcinogen.[134] Both methylazoxymethanol and 1,2-dimethylhydrazine have been found to metabolize into formaldehyde, a Group 1 known carcinogen.[135] Thus, an individual regularly exposed to DD may also have been exposed to 1,2-dimethylhydrazine, azoxymethane, methylazoxymethanol, and/or formaldehyde—each of which is recognized as a known or probable carcinogen—as these

---

[132] *Id.*

[133] G. Choudary, *Toxicological Profile for Hydrazines*, Agency for Toxic Substances and Disease Registry (1997); R.B. Wilson, *Species variation in response to dimethylhydrazine, Toxicology and Applied Pharmacology*, 38:3 (1976); M.A. Bedell, *et al.*, *Cell Specificity in Hepatocarcinogenesis: Preferential Accumulation of O6 Methylguanine in Target Cell DNA during Continuous Exposure of Rats to 1,2-Dimethylhydrazine*, Cancer Res 42:3079-3083 (1982); W.J. Visek, *et al.*, *Dietary protein and chronic toxicity of 1,2-dimethylhydrazine fed to mice*, Journal of Toxicology and Environmental Health, 32:4, 383-413 (1991).

[134] E. Fiala, *Investigations into the metabolism and mode of action of the colon carcinogen 1, 2-dimethylhydrazine*, Cancer, 36:2407-12 (Dec. 1975); S. Wolter, N. Frank, *Metabolism of 1,2-dimethylhydrazine in isolated perfused rat liver*, Chemico-Biological Interactions, 42:3, 335-344 (1982); IARC Monograph – 71-42, IARC (1987); IARC Monograph Supplement 7, IARC (1987); H. Druckrey, *Production of colonic carcinomas by 1,2-dialkylhydrazines and azoxyalkanes*, Carcinoma of the Colon and Antecedent Epithelium 267-279 (1970).

[135] P. Harbach, *et al.*, *Effects of selenium on 1,2-dimethylshydrazine metabolism and DNA alkylation* (1981); S.N. Newaz, *et al.*, *Metabolism of the Carcinogen 1,2Dimethylhydrazine by Isolated Human Colon Microsomes and Human Colon Tumor Cells in Culture* (1983); J. Erikson, *et al.*, *Oxidative Metabolism of Some Hydrazine Derivatives by Rat Liver and Lung Tissue Fractions* (1986).

compounds are oxidized and metabolized.

116.    DD is clearly linked to colorectal cancer in mice. Azoxymethane, the product of oxidized DD, is used to induce colorectal cancer in animals and has been shown to cause hepatic lesions, intestinal tumors, and renal tumors.[136] Oxidized azoxymethane produces methylazoxymethanol, which is known to cause DNA damage and has been associated with amyotropic lateral sclerosis, parkinsonism, dementia, colon cancer, liver cancer, and prostate cancer.[137] Exposure to DD—as the precursor to these carcinogenic compounds—means exposure to these other compounds and the health risks they pose.

**6.    Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl) Is A Toxic Compound.**

117.    Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl) ("DTBSBP") is "associated with the production process of the foam."[138] According to Philips, DTBSBP is emitted from PE-PUR foam under normal conditions and possibly also as the result of degradation.[139]

118.    In 2010, the Canadian government determined that DTBSBP was a Schedule 1 toxic substance under the Canadian Environmental Protection Act "based on available information regarding possible persistence, accumulation in organisms and potential to cause harm to

---

[136] M. Kobaek-Larsen, *et al.*, *Secondary effects induced by the colon carcinogen azoxymethane in BDIX rats*, APMIS 112(6):319-29 (2004 Jun.).

[137] P. Spencer, *et al.*, *Unraveling 50-Year-Old Clues Linking Neurodegeneration and Cancer to Cycad Toxins: Are microRNAs Common Mediators?*, Frontiers in Genetics 3 (2012).

[138] *See* Royal Philips Informational PDF, "Sleep and Respiratory Care Update: Clinical information" (July 8, 2021) (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)").

[139] *Id.*

organisms."[140] These findings prompted Canadian regulators to propose "virtual elimination" of DTBSBP.[141]

### E. PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY YEARS PRIOR TO THE RECALL

119.    At the time it installed PE-PUR foam into the Recalled Devices, Philips was required to test the devices in accordance with ISO 18562-2:2017 and ISO 18562-3:2017.

120.    At that time, Philips should have known the PE-PUR foam posed a safety risk to users.

121.    The FDA concluded after an investigation of Philips' Recalled Devices that beginning in at least 2008, and over time, Philips received hundreds of thousands of customer complaints regarding foam degradation in the Recalled Devices and, years later, received data from a variety of sources confirming foam degradation.

122.    The FDA's findings were based, in part, on twenty-one (21) site inspections of Philips' Murrysville, Pennsylvania facility between August 26, 2021 and November 9, 2021. The lead FDA investigator, Katelyn A. Staub-Zamperini, memorialized the agency's findings in a 28-page FDA-483 Report issued on November 9, 2021.[142] The FDA delivered the 483 Report to Rodney Mell, Head of Quality and Regulatory at Philips Respironics, on or around November 9, 2021.[143]

---

[140] *Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl)- (DTBSBP)*, Government of Canada, Canada.ca, available at: https://www.canada.ca/en/health-canada/services/chemical-substances/challenge/batch-8/1-methylpropyl.html. (last accessed Oct. 3, 2022).

[141] *Id.*

[142] *See generally,* FDA 483 Report.

[143] *Id.* at 1, 28.

123.    A 483 Report "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[144] These observations are made in a 483 Report "when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been . . . or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health."[145]

124.    In connection with the FDA's investigation for its 483 Report, the FDA learned that Philips received hundreds of thousands of complaints from customers about degradation of the foam in its Recalled Devices beginning at least as early as 2008:

> [A] query of your firm's consumer complaints from 01/01/2008 to current, for the keywords contaminants, particles, foam, debris, airway, particulate, airpath, and black, **resulted in over 222,000 complaints, and over 20,000 of which occurred between 2008 to 2017 and involved Trilogy devices**. Additionally, your firm performed a foam related complaint data analysis in April 2021 on complaints confirmed to be related to or involve foam degradation issues. The raw complaint data documents that **30 Trilogy related complaints were received from 2014 to 2017, and 1,254 related complaints were received across all products containing the affected foam, from 2014 to 2021**.[146]

125.    Yet, "[n]o formal investigation, risk analysis, or CAPA were initiated, performed, or documented [by or on behalf of Philips], in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017 . . . ."[147]

126.    A Corrective and Preventative Action ("CAPA") refers to procedures that medical device manufactures must follow to identify and attempt to correct a quality problem after one is

---

[144] *See* FDA Form 483 Frequently Asked Questions, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed Oct. 3, 2022).

[145] *Id.*

[146] 483 Report, at 12 (emphasis added).

[147] *Id.* at 16.

detected. *See* 21 C.F.R. § 820.100. A CAPA is designed "to collect information, analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence."[148]

127.   The FDA also found that Philips "was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015 . . . ."[149]

128.   In fact, an adverse event report from the FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Philips knew that a patient discovered "black dust" on her nose when she awoke after using a Philips RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."[150]

129.   Philips investigated this report and confirmed that the device contained "evidence of an unk[nown] black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path . . . ."[151]

130.   The FDA found that Philips' analysis of consumer complaints was itself defective in that it "was not adequately performed to identify or detect quality problems."[152] The FDA concluded that "potential foam degradation in Trilogy ventilator devices is not an isolated incident, and you [Philips] also have not documented a detailed rationale for why harm is not likely to occur

---

[148]  *See Food and Drug Administration, Corrective and Preventative Actions (CAPA),* https://www.fda.gov/corrective-and-preventive-actions-capahttps://www.fda.gov/corrective-and-preventive-actions-capa (last accessed Oct. 3, 2022).

[149]  483 Report, at 18.

[150]  MAUDE Adverse Event Report: RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, http://www.fdable.com/advanced_maude_query/324fd08a137ce36c2d5faf453ee26f2f   (last accessed Oct. 3, 2022).

[151]  *Id.*

[152]  483 Report, at 16.

again, as required by your Health Hazard Evaluation's instructions."[153] In light of this, the FDA concluded that Philips' "risk analysis is inadequate or was not performed when appropriate or within an appropriate time frame of your firm becoming aware" of these issues.[154]

131.    The FDA has concluded that:

Beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam contained within the recalled devices, including complaints, test reports, information from suppliers, and information from another entity owned by Philips' parent company. Philips failed to adequately evaluate this data and incorporate it into its CAPA [Corrective and Preventive Actions] system for further investigation and potential mitigation, as required by current good manufacturing practice requirements codified in 21 C.F.R. § 820.100.[155]

132.    The FDA 483 Report notes that "an incorrect and non-specified polyester polyurethane, raw foam product, sourced from your [Philips'] raw foam supplier resulted in non-conforming Trilogy Evo ventilatory finished devices being approved, released, and distributed which further resulted in the ongoing correction and removal."[156] The correction and removal "were established as part of [Philips'] response to failed VOC and ISO 18562 testing of related Trilogy EVO ventilatory medical devices, which resulted from the presence of the non-specified polyester polyurethane foam component, incorrectly supplied by [Philips'] raw foam supplier."[157]

133.    Company documents show that from at least as early as 2016, Royal Philips has demonstrated a systematic level of involvement in and control over testing the PE-PUR foam in the Recalled Devices and investigating the problems with that foam.

---

[153] *Id.* at 13.

[154] *Id.* at 3.

[155] 518(b) Notice, at 6.

[156] 483 Report, at 25.

[157] *Id.*

134.    On May 2, 2022, the FDA issued a formal notice to Philips pursuant to Section 518(b) of the FDCA, 21 U.S.C. § 360h(b) (the "518(b) Notice").[158] The 518(b) Notice stated that the FDA's "Center for Devices and Radiological Health (CDRH) is proposing that an order should be issued pursuant to section 518(b)" of the FDCA "to require Philips to submit a plan for the repair, replacement, and/or refund of the purchase price of devices subject to the recall that were manufactured after November 2015, sufficient to assure that the unreasonable risk of substantial harm to the public health presented by those devices will be eliminated."[159] This notice was directed to Thomas J. Fallon, Head of Quality, Sleep and Respiratory Care, for Philips Respironics, Inc.

135.    The 518(b) Notice stated that "there is sufficient evidence for FDA to determine that the devices subject to the recall present an unreasonable risk of substantial harm to the public health" and "that there are reasonable grounds to believe that the recalled devices that Philips manufactured after November 2015 were not properly manufactured with reference to the state of the art as it existed at the time of the devices' manufacture."[160]

136.    The FDA concluded that "patients and providers cannot readily mitigate the unreasonable risk associated with the recalled devices[.]"[161]

137.    The FDA also concluded that "[t]his risk is not the unavoidable byproduct of current ventilator, CPAP machine, and BiPAP machine technologies. Indeed, Philips and its

---

[158] 518(b) Notice.

[159] *Id.* at 1.

[160] *Id.* at 2.

[161] *Id.*

competitors market ventilators, CPAP machines, and BiPAP machines that do not use PE-PUR foam."[162]

### 1.    In 2015, Philips Communicated With Its Foam Suppliers About The Problem Of PE-PUR Foam Degradation.

138.    The PE-PUR foam that Philips used in its Recalled Devices was manufactured by William T. Burnett & Co. ("Burnett"), a bulk foam manufacturer. Burnett produces foam in sheets that are between approximately four feet to more than six feet wide and may be as long as one hundred or two hundred feet.

139.    Burnett sells its bulk foam to intermediaries, including PolyTech and The SoundCoat Company ("SoundCoat"). PolyTech and SoundCoat then sell the foam to Philips, either directly or through another intermediary, such as Paramount Die Corporation, which may modify the foam.

140.    According to the FDA, "email correspondence between [Philips] and its raw foam supplier [PolyTech] beginning 10/30/2015 and forward, document that [Philips] was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015, which was later confirmed by [Philips'] foam supplier on 08/05/2016, via email."[163]

141.    On August 5, 2016, Bob Marsh, a PolyTech employee, wrote to Lee Lawler,[164] an employee of Burnett, referencing a concern expressed by one of its customers, Philips, in the Fall of 2015 regarding foam degradation in its medical devices.[165] Mr. Marsh stated: "They [Philips]

---

[162] *Id.* at 6.

[163] 483 Report, at 18.

[164] The Affidavit of Lee Lawler, Technical and R&D Manager at Burnett ("Lawler Aff."), is filed in MDL No. 3014, Case 2:21-mc-01230-JFC, at Doc. 589-7."

[165] *See* Email exchange between Bob Marsh at PolyTech and Lee Lawler at Burnett (Lawler Aff. Exh. E, at WTB 000056.

are asking again, and wondered if we could give them any estimate on lifespan of the foam when exposed to 40 C and high humidity."[166] Mr. Lawler responded that, under those conditions, he "would not be surprised if ester foam . . . would exhibit signs of hydrolysis in as short a time as a year."[167] He added: "that is not a good environment for polyester foam. Polyether foam could last years in that environment."[168] Presumably referring to Philips, Mr. Marsh responded that he would "let them know they'd be better off with the ether."[169]

142.     Knowing about these issues with the PE-PUR foam, Philips tested the foam material used in its Recalled Devices. According to the FDA, "this testing spoke only to the limited finding that in the case of the [redacted] foam samples 'returned from service in a Pacific rim location,' spectroscopy results were 'consistent with an environmental/chemical exposure causing base polymer cleavage and embrittlement of the material.'"[170] Nonetheless, based on the results of this limited testing, Philips concluded that no escalation to a CAPA process was required.[171]

143.     According to the FDA, "no further investigation, health hazard evaluation, risk analysis, or design review was performed or documented by Philips at that time . . . and no preventative maintenance procedures were implemented[,]" other than a limited "preventative maintenance procedure" instituted by a Philips "entity owned by the parent company of Philips Respironics … to replace the air intake assembly of Trilogy ventilator products, due to complaints

---

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] 518(b) Notice, at 7.

[171] *Id.*

that had been received regarding degradation of the PE-PUR foam contained in the products."[172] And even then, "Philips did not verify the effectiveness of this measure."[173]

144. As Philips continued to ask its supplier about the properties of the PE-PUR foam and encountered more warning signs, it continued to put that foam in medical devices that millions of its customers were breathing through daily.

145. Testing conducted for Philips in 2016 confirmed that Mr. Lawler from Burnett was correct. According to the FDA, this testing "determined that the PE-PUR foam was susceptible to degradation, resulting in the conclusion at that time that 'polyester urethanes show bad resistance against high humidity in combination with high temperature.'"[174] Additional testing "determined that, compared to PE-PUR foam, another type of foam, polyether urethane, 'show[s] a far better resistance against high humidity at high temperature.'"[175]

146. The 483 Report identified "at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices."[176] It listed the specific analyses and tests, including one which concluded that "contrary to polyester urethane foams, [redacted] foams shows a far better resistance against high humidity at high temperature."[177]

---

[172] *Id.* at 6-7.

[173] *Id.* at 8.

[174] *Id.* at 7-8.

[175] *Id.* at 8.

[176] 483 Report, at 3.

[177] *Id.* at 4.

147.  Philips received at least 110 complaints confirmed to be related to foam degradation between 2014 and 2017.[178] Approximately 80 of these complaints concerned CPAP and BiPAP devices.[179]

148.  Nonetheless, Philips continued manufacturing and selling the now Recalled Devices containing PE-PUR foam and failed to warn prescribing physicians, durable medical equipment companies and the patient consumers of this problem.

### 2. Philips Opened An Internal Investigation Into Foam Degradation In Mid-2018 That Confirmed PE-PUR Foam Is Prone To Degradation.

149.  In April 2018, Philips opened a precursor to a formal CAPA, referred to by Philips as a CAPA INV 0988, "to investigate complaints related to potential foam degradation for the Trilogy devices in Australia and to determine what actions should be taken."[180] Philips reported that "[u]nits were returned from the field where the Trilogy Removable Air Path Foam [redacted] and the foam in the Inlet Air Path Assembly [redacted] was degrading, and getting into the motor/air path, causing at least 1 Trilogy unit to fail."[181]

150.  On April 20, 2018, Vincent Testa, a Project Mechanical Engineer at Philips RS, emailed Bonnie Peterson, a Project Manager at PolyTech. Mr. Testa stated, "We use the PAFS foam in the air path of our Trilogy family of ventilators as a means for noise reduction . . . ."[182] PAFS foam is PolyTech's open cell, flexible acoustical grade PE-PUR foam.[183] Mr. Testa at

---

[178] 518(b) Notice, at 7.

[179] *Id.* at 8.

[180] *Id.*

[181] 483 Report, at 14.

[182] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H), at WTB 000070.

[183]  *See* PolyTech website, https://www.polytechinc.com/products/acoustic-foamhttps://www.polytechinc.com/products/acoustic-foam (last accessed Oct. 3, 2022).

Philips continued: "Recently weve [*sic*] received a few complaints from our customers that the foam is disintegrating . . . . The material sheds and is pulled into the ventilator air path. As you can imagine, this is not a good situation for our users."[184] Mr. Testa asked, "what could cause this material to break down."[185]

151.     On April 23, 2018, Mr. Marsh from PolyTech forwarded Philips' April 20, 2018 email to Mr. Lawler from Burnett, reporting that "[t]he customer [Philips] is finding degradation of the ester foam and the urethane film in their device, such that particles are breaking off and flowing in the airstream."[186]

152.     On May 2, 2018, Mr. Marsh added in an email to Mr. Lawler that "Philips gave us another bit of information. They tested ether vs ester in high heat and humidity and found ether to be the better performer. It validated what we (you) had conveyed."[187] Mr. Marsh asked whether exposure to oxygen, higher temperature, and higher humidity could accelerate deterioration of PE-PUR foam.[188]

153.     Mr. Lawler responded that he did "not believe that exposure to oxygen will cause any significant damage to polyurethane foam unless elevated temperature and/or humidity is also present."[189]

---

[184] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H), at WTB 000070.

[185] *Id.*

[186] *See* Email from Bob Marsh to Lee Lawler dated 4/23/2018 (Lawler Aff. Exh. H), at WTB 000069-70.

[187] *See* Email from Bob Marsh to Lee Lawler dated 5/2/2018 (Lawler Aff. Exh. H), at WTB 000069.

[188] *Id.*

[189] *See* Email from Lee Lawler to Bob Marsh dated 5/2/2018 (Lawler Aff. Exh. H), at WTB 000069.

154. On May 3, 2018, Mr. Testa from Philips admitted in a follow-up email to Mr. Marsh from PolyTech, that:

> We [Philips] are evaluating our options regarding the foam. We could switch to the PAF [ether-based foam], or we could indicate a preventative maintenance cycle in which they would replace the PAFS [ester-based] foam pieces. . . . The environmental conditions for our device are a maximum of 40C and 95% R.H. Note the difference in temperature.[190]

155. Mr. Testa at Philips asked Mr. Marsh from PolyTech the following:

> 1. Please ask your foam supplier to calculate the service life based on this higher temperature (40C vs. 27C).
>
>> a. It would also be useful if they could provide a graph depicting failure over time. For example, if tensile strength reduced over time, they would plot strength vs. time.
>
> 2. At the end of the service life, what is the failure mode of this material?[191]

156. Mr. Marsh again forwarded these questions to Mr. Lawler at Burnett, who responded:

> I am unable to answer Question Number 1. We would not recommend using **polyester** foam in such an environment and have no direct data to use to calculate the rate of hydrolysis. **Polyether** foam lifetime would not be expected to reduce significantly at the stated conditions. Use with pure oxygen could shorten the lifetime some by promoting more rapid oxidation. I do not know the extent of the reduction, but do not expect it to be overly significant.
>
> Polyester foam will lose tensile strength and overall integrity as it hydrolyzes. It will eventually decompose to a sticky powder. That will happen very rapidly at 40C, 95% R.H.[192]

---

[190] *See* Email from Vincent Testa to Bob Marsh dated 5/3/2018 (Lawler Aff. Exh. H), at WTB 000068-69).

[191] *Id.*

[192] *See* Email from Lee Lawler to Bob Marsh dated 5/4/2018 (Lawler Aff. Exh. H), at WTB 000067-68 (emphasis in original).

157. Mr. Lawler from Burnett added: "Is it one of our data sheets that states foam lifetime being 10 years at 95% R.H? I do not think I have seen a sheet with that statement."[193] Mr. Marsh at PolyTech responded that he would pass along the information to Philips and that "[w]e have no idea where that statement came from. It has been on our data sheets for probably 20 years. We are removing it."[194]

158. On May 23, 2018, Mr. Marsh from PolyTech forwarded to Mr. Lawler from Burnett another question from Mr. Testa at Philips, about the degradation of the foam it was using in its Recalled Devices.[195] Mr. Testa explained that Philips had "sent samples to a local lab for analysis."[196] The local lab concluded that the degradation was a result of cleavage of the bonds in the base polymer, and Mr. Testa stated that "[f]urther investigation concluded that prolonged exposure to high humidity causes the foam to degrade."[197] Mr. Testa noted that "[a]s the foam degrades it breaks down into small particulate" and asked whether the foam "maintain[s] its UL 94 Flame Resistance rating if it is broken down into particulate?"[198]

---

[193] *Id.* at WTB 000068.

[194] *See* Email from Bob Marsh at PolyTech to Lee Lawler at Burnett dated 5/4/2018 (Lawler Aff. Exh. H), at WTB 000067. Notably, PolyTech still advertises on its website that PE-PUR foam is resistant to heat and humidity. *See* https://www.polytechinc.com/products/polymer-acoustic-foam (last accessed Oct. 3, 2022) ("Ester foams have superior physical properties and offer excellent resistance to heat, moisture, and chemicals.").

[195] *See* Email from Bob Marsh to Lee Lawler dated 5/23/2018 (Lawler Aff. Exh. H), at WTB 000066-67.

[196] *Id.* at WTB 000066.

[197] *Id.* at WTB 000067.

[198] *Id.*

159. Mr. Lawler replied: "I am sure the degraded foam will not perform well in UL94 testing, though I cannot imagine how one would actually perform the test on such degraded material."[199]

160. On June 7, 2018, Mr. Testa at Philips again emailed Mr. Marsh at PolyTech:

As we continue our investigation of the deterioration of the PAFS foam, a few questions has [*sic*] been posed regarding the material. Can you please reach out to your foam supplier regarding the following.

1. What is the actual composition of the polyurethane-ester foam PAFS-038? (CAS #s/percentages/weight percent/reactive groups etc. any chemistry is very appreciated)

2. What kind of diisocynate is used in the polyurethane foam synthesis process and how much?

3. Is diethylene glycol or another polyol utilized in the foam synthesis process?

4. Have you tested to see if all diisocyanate groups are reacted in your foam or are there unreacted groups even after manufacturing?[200]

161. Mr. Marsh (PolyTech) forwarded the questions to Mr. Lawler (Burnett), who asked why Mr. Testa (Philips) needed this information. Mr. Marsh did not provide a definitive answer but said, "What Vince [Testa] told us is that they are investigating alternatives to polyurethane foam (ester and ether)."[201] Mr. Lawler ultimately did not answer Mr. Testa's questions because they touched on Burnett's confidential, proprietary information.

---

[199] *See* Email from Lee Lawler to Bob Marsh dated 5/23/2018 (Lawler Aff. Exh. H), at WTB 000066.

[200] *See* Email from Vincent Testa to Bob Marsh dated 6/7/2018 (Lawler Aff. Exh. I), at WTB 000076-77.

[201] *See* Email from Bob Marsh to Lee Lawler dated 6/14/2018 (Lawler Aff. Exh. I), at WTB 000075.

162.     On June 20, 2018, Philips closed CAPA INV 0988.[202] According to the FDA, Philips implemented "a preventative maintenance procedure for Trilogy devices, but Philips did not verify the effectiveness of this measure."[203] Yet, "after CAPA INV 0988, Philips modified its CAPA procedures to include 'requirements to help ensure that CAPAs are fully complete [and] appropriately scoped,' and that 'processing the issue [that was the subject of CAPA INV 0988] through the current CAPA program would have result[ed] in an appropriate horizontal assessment.'"[204]

163.     The FDA pointed out that Philips' informal CAPA INV[205] related to these Trilogy devices did "not include, investigate, or examine all of [Philips'] CPAP and BiPAP medical devices, which also include similar air path assemblies and/or the affected polyester polyurethane [PE-PUR] foam, which is susceptible to degradation."[206] But Philips had acknowledged to the FDA that it had "received approximately eighty complaints related to foam degradation, **on non-Trilogy ventilator devices**, from 2014 to 2017."[207]

164.     The FDA concluded that Philips had not "adequately established" a process for initiating CAPA procedures.[208] Specifically, the FDA faulted Philips for not initiating a "formal" CAPA after receiving "various complaints alleging foam degradation in Trilogy ventilator

---

[202] 483 Report, at 15.

[203] 518(b) Notice, at 8.

[204] *Id.*

[205] The 483 Report explained that Philips' practice at the time was to first open CAPA requests—called "CAPA INVs"—as a precursor to a formal CAPA, but this could only occur if approved by a "CAPA Review Board" or delegate. *See* 483 Report, at 14-15.

[206] *Id.* at 15.

[207] *Id.* at 16 (emphasis added).

[208] *Id.* at 14.

devices" and then closing its informal investigation just two months later without "verify[ing] the effectiveness" of the limited "preventative maintenance procedure for Trilogy devices."[209]

165.    Philips continued to receive more information suggesting that the PE-PUR foam was prone to degradation. According to the FDA, "[a] follow-up email amongst [Philips'] personnel, dated 08/24/2018, states that testing confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints . . . ."[210]

166.    Further, "[o]n December 12, 2018, several months after CAPA INV 0988 was closed, a report from additional testing conducted for Philips found that '[p]olyester polyurethane foam showed clear disintegration after 2 weeks."[211]

167.    Nonetheless, Philips continued manufacturing and selling the Recalled Devices containing PE-PUR foam.

168.    Philips failed to apprise the FDA of the facts and problems it learned from its foam suppliers about premature foam degradation risks.

169.    Philips failed to apprise the FDA of consumer, medical provider and durable medical equipment company reports of the presence of foam particles and other device failures.

### 3.    Philips Finally Opened A Formal CAPA In 2019 – But Did Not Initiate A Recall For Two More Years.

170.    In April 2019, Philips received two complaints that "sound abatement foam 'is degrading and entering the air path[.]'"[212]

---

[209] 518(b) Notice, at 8.

[210] 483 Report, at 18.

[211] 518(b) Notice, at 8.

[212] *Id.*

171.    In response, in June 2019, Philips finally initiated a formal CAPA, numbered

CAPA 7211, related to the issues associated with the PE-PUR foam. But as the FDA explains:

> Even then, that CAPA failed to evaluate all relevant data. Philips' search of FDA's
> Manufacturer and User Facility Device Experience (MAUDE) database in
> connection with CAPA 7211 identified only three medical device reports (MDRs)
> associated with potential foam degradation involving Trilogy ventilators between
> January 2011 and January 2021. Yet an MDR analysis conducted by Philips in 2018
> had already identified 17 documented complaints related to foam degradation in
> Trilogy ventilators, and at least 14 of those 17 complaints had related MDRs.
> Similarly, Philips' analysis of foam degradation-related complaints conducted in
> connection with CAPA 7211 identified 1,254 complaints confirmed to be related
> to foam degradation between 2014 and April 2021 across all affected products, yet
> this analysis failed to include several complaints confirmed to be related to foam
> degradation in Trilogy ventilators that were documented in 2018 in connection with
> CAPA INV 0988.[213]

172.    Philips continued to test the PE-PUR foam while the CAPA was underway. A

Biological Risk Assessment dated July 2, 2020, found that "the biological and toxicological risks

from exposure to degraded PE-PUR foam are of concern...."[214]

173.    Another internal "Biological Risk Assessment" dated December 10, 2020 – and

"conducted as a result of field reports/complaints regarding degraded sound abatement foam in

various CPAP and ventilator products"[215] – described the risks that degraded polyurethane foam

posed to humans in no uncertain terms:

> The cytotoxicity and positive genotoxicity results observed from degraded PE-PUR
> foam samples **indicate a potential patient risk. Potential cytotoxicity and
> genotoxicity leading to carcinogenicity are possible outcomes from degraded
> PE-PUR foam exposure.** Overall, based on an understanding of the toxicological
> significance of the foam degradants and the results of the ISO 10993 testing to
> include mutagenic responses in both a bacterial and mammalian system, **the
> degraded PE-PUR foam is not considered biocompatible and presents a**

---

[213] *Id.* at 8-9.

[214] 483 Report, at 7 ("Philips Respironics Inc. (PRI) was made aware in May 2019 that four CPAP units were returned to a service center with degraded sound abatement foam.").

[215] *Id.* at 8.

**significant biological risk to those patient populations who are exposed to degraded PE-PUR foam.**[216]

174.    An additional Philips' Biocompatibility Risk Assessment dated January 11, 2021, concurred that degraded PE-PUR foam "presents a significant biological risk to patients," and admitted that "[p]otential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure."[217]

175.    Ultimately, in CAPA 7211, Philips concluded that "the cause of the foam degradation condition is long-term exposure to environmental conditions of high temperature combined with high humidity" and reiterated that "the cause of degradation was due to chemical breakdown of the foam due to exposure to water caused by long-term exposure to environmental conditions."[218]

176.    Based on its investigation, the FDA concluded that Philips' upper management was aware of the foam degradation issues, discussed it at numerous management review meetings, and yet delayed doing anything to rectify or mitigate the hazards:

> [F]irm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and Trilogy ventilators since at least 01/31/2020, or earlier, and implemented no further corrective actions until April 2021.

> Polyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at all [redacted] management review meetings, since the 2019 [redacted], dated 01/31/2020 . . . . Additionally, your firm [Philips] became aware of this issue and related field complaints in at least 2015 or earlier.[219]

F.    **PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT KNEW OF THE PROBLEMS**

---

[216] *Id.* at 7-8 (emphasis added).

[217] *Id.* at 8.

[218] 518(b) Notice , at 10.

[219] 483 Report, at 24.

**WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH
RISKS.**

      1.      **Philips Never Hinted at the Dangerous Condition of the Recalled
Devices.**

177.    At no point prior to April 2021, when Philips first disclosed foam issues to its
shareholders, did Philips even hint that there was a dangerous condition in its recalled CPAP,
BiPAP, and ventilator devices. Instead, Philips held itself out as a trusted brand and "global leader
in the sleep and respiratory markets."[220] Its branding promises consumers that they will "[b]reath
easier, sleep more naturally[.]"[221] Philips further assures consumers that its "sleep therapy systems
are designed with the needs of care practitioners and patients in mind," and that its "quality systems
reflect [Philips'] commitment to providing enhanced patient comfort," among other things.[222] And
it has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep
disorders.[223]

178.    Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep
physicians."[224] The CPAP and BiPAP machines routinely cost from seven or eight hundred dollars
to thousands of dollars per machine, and the ventilators cost more than several thousands of dollars
per machine.

      2.      **Philips Knew Some of its Customers Were Using the SoClean Ozone
Cleaning Technology with its Devices and Assented to Such Use.**

---

[220] *See* Philips Respironics website – About Philips Respironics,
http://www.respironics.com/product_libraryhttp://www.respironics.com/product_library (last
accessed Oct. 3, 2022).

[221] *Id.*

[222] *Id.*

[223] *See* https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (last accessed Oct. 3,
2022).

[224] *Id.*

179.    Philips was fully cognizant that many users were utilizing the So-Clean Ozone product in conjunction with its device.

180.    For example, on March 6, 2020, in a letter responding to a customer's request for written guidance, Philips Respironics said using SoClean on its DreamStation will not automatically void the warranty, but the company "reserves the right to void a warranty if it is determined that the use of SoClean caused a defect for which a device otherwise under warranty was returned."[225] The company said in a statement to HME News that it "does not formally validate the use of SoClean with the DreamStation, but as of Jan. 6, Philips has not denied a warranty claim associated with the use of SoClean with a DreamStation."[226] Philips told HME News it wrote the letter "to limit confusion and misinformation."[227] The article in HME News further quoted Philips stating that "Philips is in communication with SoClean to further analyze the potential compatibility of the SoClean with DreamStation therapy devices, and will provide further information as it becomes available," the company told HME News.[228]

181.    By virtue of that communication to a trade journal, Philips not only acknowledged its awareness of the use of the product, but also acknowledged it received warranty complaints amongst users of the DreamStation who also used SoClean, and honored the warranties and communicated with SoClean.

182.    Additional evidence that Philips was aware that SoClean was selling a product specifically designed to be used in conjunction with the DreamStation is the website of

---

[225] *Business News For Home Medical Equipment Providers* (March 6, 2020), at https://www.hmenews.com/article/cpap-manufacturers-address-certain-cleaning-devices (last accessed Oct. 3, 2022).

[226] *Id.*

[227] *Id.*

[228] *Id.*

CPAPDIRECT.COM, a major internet provider of CPAP machines and related paraphernalia which advertised an express adapter kit for So Clean and Dream Station products.[229] Similarly numerous other internet and durable medical equipment companies and retail suppliers of Philips CPAP devices also sold SoClean to be used in conjunction with the Devices, and Philips expressly and impliedly was aware of this combined use.

183.    Given that Philips was on notice since at least 2008 of a foam degradation concern, and was also aware of the combined use of its Devices with SoClean, to the extent there is any validity to Philips recent claims attributing foam degradation to SoClean ozone treatment, Philips should have and could have made the same attributions and affirmatively stepped up to expressly warn medical providers, Durable Medical Equipment companies and patients against the combined use of the  products in allegedly contributing to premature foam degradation.

184.    Instead, recognizing that SoClean consumers seemingly liked having this additional cleaning modality, Philips declined to dissuade patients and customers from the combined use due to a concern that they would lose business to alternative CPAP manufacturers who also tacitly or expressly condoned such joint use.

### 3.    Philips Sold Its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam.

185.    Philips sold humidifiers to accompany its CPAP devices,[230] especially the DreamStation, stating in the humidifier's User Manual under the heading "Intended Use": "The

---

[229] *See* CPAPdirect Products Page – SoClean Respironics System One & DreamStation Adapter, https://www.cpapdirect.com/cleaning/soclean-respironics-system-one-and-dreamstation-adapter (last accessed Oct. 3, 2022).

[230] Philips' humidifiers are not compatible with CPAP devices manufactured by other companies like ResMed.

DreamStation Heated Humidifier is an accessory for the Philips Respironics DreamStation therapy devices to provide moisture to the patient circuit."[231]

186.    The humidifier manual quoted above had, under the heading "DreamStation Heated Humidifier Specifications" had environmental specifications that included an "Operating Temperature: 5° to 35° C (41° to 95° F")" as well as "Storage Temperature: -20° to 60° C (-4° to 140° F)" and "Relative Humidity (operating & storage): 15 to 95% (non-condensing)."[232]

187.    Philips provided the humidifier option explaining in the DreamStation User Manual that "[y]ou can use the heated humidifier and the heated tube with your device. They are available from your home care provider. A humidifier may reduce nasal dryness and irritation by adding moisture to the airflow."[233]

188.    Philips not only knew but recommended the use of the humidifier, and also advised that the device could be stored in a room as warm as 140° F despite their knowledge that warm, hot and humid conditions contributed to rapid degradation of its sound insulating foam.

189.    The vast majority of DreamStation patients use the Philips humidifier with their devices.

**G.    PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM.**

**1.    Prior to the Recall, In April And May 2021, Philips Launched The DreamStation 2 (Which Does Not Contain PE-PUR Foam).**

---

[231]    *See*    DreamStation    Humidifier    User    Manual, https://www.documents.philips.com/doclib/enc/11410694/DreamStation_Humidifier_User_Manual.pdf, at 1 (last accessed Oct. 3, 2022).

[232] *Id.* at 12.

[233] *See, e.g.*, DreamStation User Manual, at 22.

190. Two months prior to the Recall, Philips announced on April 13, 2021, that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family. The DreamStation 2 does not contain PE-PUR foam.

191. Less than two weeks after its launch of the DreamStation 2, on April 26, 2021, Philips announced that its previous generation of DreamStation products and other Recalled Devices posed serious health risks to users. In the same release, Philips tried to convince consumers to purchase and use its new DreamStation 2 device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.[234]

192. Even when making this announcement, Royal Philips downplayed the significance of the problem claiming "the occurrence rate is very, very low."[235] At the same time, Royal Philips assured its shareholders that any adverse impact on sales due to the safety risks posed by the

---

[234] *See* Royal Philips announces its 2021 First-Quarter Results (Apr. 26, 2021), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html#:~:text=The%20Diagnosis%20%26%20Treatment%20businesses%20recorded,Imaging%20and%20Image%2DGuided%20Therapy (last accessed Oct. 4, 2022).

[235] Transcript of Koninklijke Philips NV Earnings Call for First Quarter 2021 Results (April 26, 2021), Fair Disclosure Wire.

Recalled Devices was minimized by introduction of the DreamStation 2: "The good thing is, is that we have launched DreamStations 2."[236]

## 2. Testing Continued To Confirm The Recalled Devices Were Defective and the FDA Received Additional MDRs.

193. Even as it launched the DreamStation 2 device and announced publicly that its previous generation DreamStation products posed serious health risks to users, Philips continued to conduct tests that confirmed some of its breathing products were defective.

194. For example, on May 17, 2021, Ken Cole from RJ Lee, an industrial forensics analytical laboratory and scientific consulting firm, produced a presentation analyzing the foam in Philips' Trilogy EVO devices. The presentation states that the investigation was "prompted by staff observation of color variance across both current production and previous builds."[237]

195. The analysis involved six samples of foam, two from units built in 2018 and four taken from Philips' current production stock in May 2021.[238] Some of the samples from 2021 showed "differing cell structure" which is an "[i]ndication of poor process control."[239] The 2021 foam had "significant contaminants."[240] The foam was supposed to be ether-based,[241] but testing revealed indications that some of the foam was actually ester-based.[242]

---

[236] *Id.*

[237] *See* RJ Lee Analysis Review of Trilogy EVO Foam (Lawler Aff. Exh. A), at (WTB 000001-14).

[238] *Id.* at WTB 000006.

[239] *Id.* at WTB 000008.

[240] *Id.* at WTB 000009; *see also* WTB 000010 ("Indication of poor process control and/or contamination.").

[241] *Id.* at WTB 000002.

[242] *Id.* at WTB 000013.

196.    In addition, MDRs associated with the PE-PUR foam breakdown increased significantly.[243] From 2011 to April 2021 when Philips first notified the FDA of their intention to conduct a field action due to concerns pertaining to foam degradation (breakdown) in certain ventilators, BiPAP machines, and CPAP machines, Philips submitted only 30 MDRs that they identified as associated with the PE-PUR foam breakdown and there were no reports of patient injury or death among those 30 MDRs.[244] Eight of those reports were from the United States.

197.    After Philips notified the FDA of its intention to conduct a field action in April 2021 through July 31, 2022, the amount of MDRs the FDA received increased significantly as did the "reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown."[245] Specifically, the FDA reported:

- From April 2021 through April 30, 2022, the FDA received more than 21,000 MDRs, including 124 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

- From May 1, 2022, through July 31, 2022, the FDA received more than 48,000 MDRs, including 44 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

---

[243] As stated above, manufacturers, such as Philips, are required to submit medical device reports (MDRs) when information reasonably suggests that their device may have caused or contributed to a death or serious injury, or has malfunctioned, and that device or a similar device they manufacture would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. Health professionals, consumers, and patients may voluntarily submit reports of device adverse events and malfunctions to the FDA. *See, e.g.*, 21 C.F.R. § 803.20.

[244] The FDA's latest information about medical device reports (MDRs) associated with the Recalled Devices on August 16, 2022 is available here: https://www.fda.gov/medical-devices/safety-communications/update-certain-philips-respironics-ventilators-bipap-machines-and-cpap-machines-recalled-due?utm_medium=email&utm_source=govdelivery#mdr (last accessed Oct. 3, 2022) ("FDA MDR Update").

[245] *Id*. (stating "The MDRs received included both mandatory reports from Philips and voluntary reports from health professionals, consumers, and patients.").

198. The FDA continued: "A wide range of injuries have been reported in these MDRs, including cancer, pneumonia, asthma, other respiratory problems, infection, headache, cough, dyspnea (difficulty breathing), dizziness, nodules, and chest pain."[246]

## 2. Finally, In June 2021, Philips Recalled Its Defective Devices.

199. Finally, on June 14, 2021, Philips issued a recall notice directed to its customers in the United States, stating:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.
>
> Therefore, Philips has decided to voluntarily issue a recall notification* to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.[247]

200. Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family."[248] Philips elaborated:

> Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:
>
> For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

---

[246] *Id.*

[247] Philips Recall Notices dated June 14, 2021.

[248] *Id.*

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.[249]

201. Corroborating the dangerous nature of the Recalled Devices, on July 22, 2021, the FDA upgraded Philips' recall of the Recalled Devices to its most serious classification, Class I, which according to the FDA means: "A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death."[250]

202. Philips' Recall announcement instructed users to not use the Recalled Devices because of the health risks. This confirmed the true nature of the recalled products, which at all times were adulterated and worthless.

203. Philips took similar action with respect to its defective CPAP, BiPAP, and ventilator devices across the globe.

---

[249] *Id.*

[250] *See* FDA – Recalls Background and Definitions, https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions (last accessed Oct. 3, 2022).

204.     Also, on June 14, 2021, Philips' main competitor, ResMed, issued "[a] message

from ResMed's CEO" to the public regarding the Philips Recall. In this notice, ResMed CEO,

Mick Farrell, stated that "ResMed devices are safe to use and are not subject to Philips' recall.

ResMed devices use a different material than what Philips uses in their recalled machines."[251]

205.     ResMed devices and ventilators use polyether polyurethane or silicone-based foam,

not PE-PUR foam, for sound abatement purposes.[252]

### H.     THE MEASURES TAKEN BY PHILIPS, AND BY ROYAL PHILIPS IN PARTICULAR, TO RECALL AND REPLACE THE DEFECTIVE DEVICES HAVE BEEN INADEQUATE AND INEFFECTIVE.

206.     From the outset, Royal Philips has directly overseen and managed the Recall

announced on June 14, 2021.

207.     Royal Philips tasked a member of its Executive Committee, Roy Jakobs, with

leading the company's repair and remediation program.[253] Mr. Jakobs is in charge of Philips'

---

[251] *See* ResMed website – A message from ResMed's CEO, https://www.resmed.com/en-us/healthcare-professional/other-manufacturer-recall-2021/ (last accessed Oct. 3, 2022).

[252] *See* ResMed website – An update from ResMed's CEO, https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Oct. 4, 2022).

[253] *See* Royal Philips Press Release, "Philips announces CEO succession" (Aug. 16, 2022); *see also* video titled "Philips CEO Frans van Houten and Chief Business Leader Connected Care Roy Jakobs talk about the various aspects of the field safety notice," available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2022/20220628-philips-provides-update-on-philips-respironics-pe-pur-sound-abatement-foam-test-and-research-program.html (last accessed Oct. 3, 2022). With respect to the Recall, Mr. Jakobs has said: "I have a dedicated team of over 1,000 colleagues fully focused on this [the repair and replacement program], supported by many more across the company." *See also* Royal Philips Press Release, "Philips provides update on Philips Respironics' PE-PUR sound abatement foam test and research program" (June 28, 2022), available at: https://www.usa.philips.com/healthcare/e/sleep/communications/src-update/news/philips-provides-update-on-philips-respironics-pe-pur-sound-abatement-foam-test-and-research-program (last accessed Oct. 3, 2022).

Connected Care businesses that include Philips RS.[254] Royal Philips claims that "[s]ince taking on responsibility for the voluntary recall notification/field safety notice for specific Respironics devices on behalf of Philips, substantial progress has been made under his [Mr. Jakobs'] leadership in the execution of the comprehensive program aimed at delivering a resolution to affected patients as fast as possible in consultation with the relevant competent authorities."[255]

208. In addition to Mr. Jakobs, Royal Philips' Technical Project Manager Jan Bennik "head[s] up the polyester-polyurethane sound abatement foam test and research program."[256] He has spoken publicly on behalf of Philips about the recalled devices.

209. Further, the following additional Royal Philips employees are believed to have knowledge of the Recall of the devices[257]: a) Liz Iversen, Former Chief Quality and Regulatory

---

[254] *See* Royal Philips First-Quarter Results 2022 (Apr. 25, 2022), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022) ("Philips has a strong program management in place led by Roy Jakobs, Chief Business Leader of the Connected Care businesses and member of Philips' Executive Committee, to ensure the Respironics field action is executed with speed and accuracy."); *see also* Test and research program Respironics PE-PUR sound abatement foam, available at: https://www.philips.com/c-dam/corporate/newscenter/global/standard/resources/healthcare/2022/podcast-healthier-future/Transcript_-_Philips_Test_and_research_program_Respironics_PE-PUR_sound_abatement_foam.pdf (last accessed Oct. 3, 2022).

[255] *Id.*

[256] Technical Project Manager Jan Bennik speaks about the test and research program, video available at: https://www.philips.com/a-w/about/investor-relations/recall-sleep-and-respiratory/testing.html (last accessed Oct. 3, 2022).

[257] *See* Letter dated September 15, 2022, from all Philips Defendants, at 3-6 (section regarding agreed-upon initial custodians from which to pull responsive discovery).

Officer[258]; b) Jan Kimpen, Chief Medical Officer (Netherlands-based)[259]; and c) Carla Kriwet, Former Chief Business Leader Connected Care (Netherlands-based).[260]

210. Upon information and belief, Philips NA has also been involved with the Recalled Devices and the Recall.[261] For example:

a. Tom Reimann, Head of Quality of Connected Care, likely "has knowledge regarding the manufacture, regulatory evaluation, and quality assurance review of certain devices and the recall of the devices."[262]

b. Thomas Catalano, Director of Product Marketing, is "Lead global product management team in $1 bill sleep business unit."[263] His prior role with Philips was as a Global product Manager, involved with "Development product/service pipeline for next generation of CPAP therapy to treat obstructive apnea."[264]

c. Francis Kim, EVP Chief Quality & Regulatory Officer[265];

---

[258] Liz Iversen had "global executive responsibility and accountability" for Royal Philips. On LinkedIn, she described her role with Royal Philips as follows: "Global executive responsibility and accountability for Quality, Regulatory, Clinical, Medical and Compliance to ensure delivery of safe and effective products across the enterprise while executing regulatory and quality strategies in support of business growth." LinkedIn Profile for Liz Iversen, Experience section, available at: https://www.linkedin.com/in/ediversen/ (last accessed Oct. 3, 2022).

[259] As Chief Medical Officer Jan Kimpen "worked collaboratively with business and functional leaders across the organization" including "provid[ing] clinical guidance for the development and market introduction of all new product...[and] advis[ing] Philips' board and management in making decisions on market participation, product development, …and product launches." *See* LinkedIn profile for Jan Kimpen, Experience section.

[260] Ms. Kriwet's LinkedIn Profile states she was the "CEO, Connected Care, Member of the Royal Philips Executive Committee" from 2017-2020. *See* LinkedIn Profile for Carla Kriwet, Experience section, available at: https://www.linkedin.com/in/dr-carla-kriwet/ (last accessed Oct. 3, 2022).

[261] *See* Letter dated September 15, 2022, from all Philips Defendants, at 3-6 (section regarding agreed-upon initial custodians from which to pull responsive discovery).

[262] Philips RS North America LLC's Initial Disclosures, dated May 5, 2022.

[263] *See* LinkedIn Profile for Thomas Catalano, available at: https://www.linkedin.com/in/thomas-catalano-5a66552/ (last accessed Oct. 4, 2022).

[264] *Id.*

[265] *See* LinkedIn Profile for Francis Kim, available at: https://www.linkedin.com/in/francis-k-2b32a111a (last accessed Oct. 5, 2022).

d. Erin Levering, Medical Safety Manager, was responsible for working "with the Post-Market Surveillance team to assess individual complaints for safety concerns and regulatory reporting requirements."[266];

e. Vitor Rocha, Chief Market Leader – "CEO North America, EVP at Philips…responsible for driving growth, expanding market share and advancing Philips' position…"[267]; and

f. Jessica Shen, Former Senior Vice President, Global Head of Medical Affairs, Clinical Affairs, HEOR & Regulatory Affairs. April 2015 – August 13, 2021.[268] – "Responsible for pre-market, regulatory approval for commercialization of products and solutions, including the development of key regulatory and clinical strategies to bring new technologies to market with the shortest possible cycle time; and the harmonization of regulatory/clinical processes across all Philips product lines; Work closely with global regulatory officials to further advance Philips' relationship and reputation among these important groups; and continue to build out our core internal competencies and strengthen our regulatory, Medical & clinical team."[269]

211. While the Recall began in the United States, it has been expanded worldwide.[270]

---

[266] See LinkedIn Profile for Erin Levering, available at: https://www.linkedin.com/in/erin-levering-bs-rn-certified-nurse-practitioner-034920178/?trk=public_post_comment-text (last accessed Oct. 5, 2022).

[267] See LinkedIn Profile for Vitor Rocha, available at: https://www.linkedin.com/in/vitor-rocha-98582124/ (last accessed Oct. 4, 2022).

[268] Id.

[269] See LinkedIn Profile for Jessica Shen, available at: https://www.linkedin.com/in/jessica-shen-md-ms-b386016/ (last accessed Oct. 4, 2022).

[270] See Philips website, Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand) (stating that a global recall notification was issued on June 14, 2021 and that recalls specific to Australia and New Zealand were issued on July 2, 2021). Other impacted countries include, but are not limited to, Australia, Canada, Israel, and Chile. In addition to the litigation initiated against Philips in the United States, "Philips or its affiliates are also defendants in litigation in Australia, Canada, Chile, and Israel, as well as in smaller or individual actions in other countries." Royal Philips First Quarter Results 2022 - Presentation at 37 (Apr. 25, 2022), available for download at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022). In a video produced by Royal Philips, Chief Business Leader of the Connected Care businesses Roy Jakobs said: "We have more than 5.5 million patients from over 100 countries who need a replacement." See Philips video, available at: https://www.philips.com/a-w/about/investor-relations/recall-sleep-and-respiratory/testing.html (last accessed Oct. 3, 2022). For example, there are 350,000 affected Philips CPAP devices and

212.  Since June 2021, Royal Philips has issued numerous press releases specifically providing information about the worldwide recall.[271]

_____

29,500 affected Philips ventilators in France. ANSM (France) – Public Hearing Comité Scientifique Temporaire (June 8, 2022), available at: https://www.youtube.com/watch?v=ctvL0TcmWO8 (last accessed Oct. 3, 2022). In France, the Agence nationale de sécurité du médicament et des produits de santé (ANSM) had public hearings regarding the recall on June 8, 2022. Technical Project Manager Jan Bennik of Royal Philips was among the representatives of Philips who spoke at the hearings. *Id.* CEO van Houten has said that Philips is "[i]n close dialogue with regulators across the world." Philips 2021 Annual Report at 5. French prosecutors have opened a preliminary investigation into Philips' recall. A spokesperson for the Paris public prosecutor's office said the office had "taken up, as of June 20, 2022, complaints filed on the grounds of aggravated deception, involuntary attacks on physical integrity, endangerment of life of others and administration of harmful substances." Charlotte Van Campenhout, French Prosecutors Probe Philips Respirator Recall, Reuters, Sept. 8, 2009, available at: https://www.reuters.com/business/healthcare-pharmaceuticals/french-prosecutors-probe-philips-respirator-recall-france-info-reports-2022-09-08/ (last accessed Oct. 3, 2022).

[271] *See, e.g.,* Royal Philips Press Release, "Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices" (June 14, 2021); Philips Press Release, "Philips starts repair and replacement program of first-generation DreamStation devices in the US in relation to earlier announced recall notification*" (Sept. 1, 2021); Royal Philips Press Release, "Philips provides update on earlier announced voluntary CPAP, BiPAP and Mechanical Ventilator recall notification*" (Nov. 14, 2021); Royal Philips Press Release, "Philips provides update on the test and research program in connection with the CPAP, BiPAP and Mechanical Ventilator recall notification*" (Dec. 23, 2021), available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20211223-philips-provides-update-on-the-test-and-research-program-in-connection-with-the-cpap-bipap-and-mechanical-ventilator-recall-notification.html (last accessed Oct. 3, 2022); Royal Philips Press Release, "Philips Respironics provides update for the US on ongoing CPAP, BiPAP and Mechanical Ventilator field action" (Mar. 10, 2022), available at: https://www.philips.com/a-w/about/news/archive/standard/news/2022/20220311-philips-respironics-provides-update-for-the-us-on-ongoing-cpap-bipap-and-mechanical-ventilator-field-action.html (last accessed Oct. 3, 2022); Royal Philips Press Release, "Philips Respironics provides update on filed MDRs in connection with the voluntary recall notification/field safety notice* for specific CPAP, BiPAP and mechanical ventilator devices" (May 24, 2022), available at: https://www.philips.com/a-w/about/news/archive/standard/news/2022/20220524-philips-respironics-provides-update-on-filed-mdrs-in-connection-with-the-voluntary-recall-notification-field-safety-notice.html (last accessed Oct. 3, 2022); Royal Philips Press Release, "Philips provides update on Philips Respironics' PE-PUR sound abatement foam test and research program" (June 28, 2022).

213.    Royal Philips also discusses the Recall and the alleged Defect in the products in other communications and press releases such as those about its quarterly results.[272]

214.    For example, when the problems with the Recalled Devices were first announced to Philips' shareholders, Royal Philips included in its April 26, 2021 press release regarding First Quarter 2021 results, the following statement from CEO Frans van Houten: "Regretfully, we have identified a quality issue in a component that is used in certain sleep and respiratory care products, and are initiating all precautionary actions to address this issue, for which we have taken a EUR 250 million provision."[273]

215.    In the same press release, Royal Philips said: "Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity

---

[272] Philips announcement of 2021 First-Quarter Results (Apr. 26, 2021), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed Oct. 3, 2022); Philips announcement of 2021 Second-Quarter Results (July 26, 2021), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-second-quarter-results-2021.html (last accessed Oct. 3, 2022); Philips announcement of 2021 Third-Quarter Results (Oct. 18, 2021), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-third-quarter-results-2021.html (last accessed Oct. 3, 2022); Philips announcement of Fourth Quarter and Annual Results 2021 (Jan. 24, 2022), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-fourth-quarter-results-2021.html (last accessed Oct. 3, 2022); Philips announcement of First-Quarter Results 2022 (Apr. 25, 2022), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022); Philips announcement of Second-Quarter Results 2022 (July 25, 2022), available at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-second-quarter-results-2022.html (last accessed Oct. 3, 2022).

[273] Philips announces its 2021 First-Quarter Results (Apr. 26, 2021).

and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks."[274]

216.    In a June 14, 2021 press release, Royal Philips said: "Philips is initiating a voluntary recall notification* to ensure patient safety in consultation with regulatory agencies."[275] Royal Philips CEO van Houten said: "In consultation with the relevant regulatory agencies and in close collaboration with our customers and partners, we are working hard towards a resolution, which includes the deployment of the updated instructions for use and a comprehensive repair and replacement program for the affected devices."[276]

217.    This announcement from Royal Philips further stated that "Philips determined based on testing that there are possible risks to users related to this type of foam"; "Philips" decided to issue the recall notification; "Philips has received reports of possible patient impact due to foam degradation"; "Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction"; and "Philips' recently launched next-generation CPAP platform" is not affected by the foam degradation issues.[277]

---

[274] *Id.* (footnote omitted).

[275] Royal Philips Press Release, "Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices" (June 14, 2021).

[276] *Id.*

[277] *Id.*

218.     Mr. van Houten also stated in the Recall announcement on June 14, 2021: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety."[278]

219.     Later in 2021, Royal Philips emphasized its involvement in the Recall program in various publications. For example, a presentation on Royal Philips' Fourth Quarter 2021 Results noted: "Regular review cadence with Respironics field action Program Management and Executive Committee."[279] The same presentation said: "Philips' experts as well as certified labs and qualified third party experts are working closely with the Respironics team."[280] The presentation also indicated an effort to "step-up company-wide program."[281]

220.     The 2021 Philips Annual Report shows that in addition to Royal Philips' Management, Royal Philips' Supervisory Board and Royal Philips' Quality and Regulatory Committee were also involved in the Recall. For example, the Royal Philips Supervisory Board reported: "In view of the Philips Respironics voluntary recall notification related to the sound abatement foam in certain sleep and respiratory care products (announced on June 14, 2021), the Supervisory Board regularly discussed this issue and the progress made with respect to the repair and replacement program with Management."[282] Further, the Royal Philips Quality and Regulatory Committee reported that, at its meetings, it discussed "matters associated with [the recall], such as

---

[278] *Id.*

[279] Philips Fourth Quarter and Full Year 2021 Results – Presentation at 39 (Jan. 24, 2022), available for download at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-fourth-quarter-results-2021.html (last accessed Oct. 3, 2022).

[280] *Id.*

[281] *Id.* at 36.

[282] Philips 2021 Annual Report, at 95.

interactions with regulatory authorities globally, engagement with patients, physicians, customers and durable medical equipment providers, testing, health hazard evaluations, and the status of the repair and remediation plan."[283]

221.    At the May 2022 shareholders meeting for Royal Philips, CEO van Houten said: "Our team is laser-focused on resolving the sleep recall[.]"[284] He added, regarding the recall: "We have established a dedicated team of 1,000 colleagues working under the direct supervision of the Executive Committee."[285] He explained: "I can tell you that the Philips Board of Management became aware of the issue and its potential significance in the first quarter of 2021 and took adequate and immediate action. This resulted in the issuance of the field safety notice and start of the remediation actions in the first half of 2021."[286]

222.    Royal Philips' CEO van Houten made frequent statements about the Recall. For example, in the 2021 Royal Philips Annual Report, Mr. van Houten said: "We identified – through our post-market surveillance processes – that <u>the sound abatement foam used since 2008 in certain of our sleep and respiratory care products may degrade under certain circumstances</u>. Subsequently, we issued a voluntary recall notification for affected devices to address potential health risks."[287] In July 2021, he said: "We have mobilized the necessary resources across the company to address the component quality issue in certain of our sleep and respiratory care products."[288] In a January 24, 2022 press release, he said, "we remain extremely focused on repairing and replacing the

---

[283] *Id.* at 115-16.

[284] Transcript of Koninklijke Philips NV Annual Shareholders Meeting (May 22, 2022), Fair Disclosure Wire.

[285] *Id.*

[286] *Id.*

[287] Philips 2021 Annual Report at 5 (emphasis added).

[288] Philips Second-Quarter Results 2021 (July 26, 2021)

devices related to the Philips Respironics recall notification."[289] And in April 2022, he said, "[w]e have a strong program management in place overseeing every aspect of the remediation[.]"[290]

223.    On the same day that the FDA announced that reports of faulty Philips ventilators and sleep apnea machines had risen, Royal Philips announced that CEO van Houten would be stepping down.[291] CEO van Houten's departure announcement followed a May 2022 Royal Philips shareholders meeting where 80% of shareholders voted against giving Mr. van Houten a bonus. Shareholders were "unhappy about delivery problems and issues with the company's widely used sleep apnea machines."[292]

224.    Royal Philips' public statements demonstrate that it has been involved with U.S. regulatory authorities since the announcement of the Recall. In press releases and other statements, Royal Philips has discussed working with the FDA. For example, in a September 1, 2021 press release, Royal Philips said: "Philips received authorization from the US Food and Drug Administration (FDA) for the rework of the affected first-generation DreamStation devices, which consists of replacement of the PE-PUR sound abatement foam with a new material. Philips anticipates rework to commence in the course of September 2021. In addition to the rework, the company has already started replacing certain affected first-generation DreamStation CPAP

---

[289] Philips Fourth Quarter and Annual Results 2021 (Jan. 24, 2022).

[290] Philips First Quarter Results 2022 (Apr. 25, 2022).

[291] Toby Sterling and Bart H. Meijer, FDA says faulty Philips device reports accelerating as CEO departs, Reuters, Aug. 17, 2022, available at: https://www.reuters.com/business/healthcare-pharmaceuticals/fda-says-faulty-philips-device-reports-accelerating-ceo-departs-2022-08-17/ (last accessed Oct. 3, 2022).

[292] Roy Jakobs to take over the helm at Philips as Frans van Houten steps down, DutchNews.nl (Aug. 16, 2022), available at: https://www.dutchnews.nl/news/2022/08/roy-jakobs-to-take-over-the-helm-at-philips-as-frans-van-houten-steps-down/ (last accessed Oct. 3, 2022).

devices in the US with DreamStation 2 CPAP devices. Philips remains in dialogue with the FDA with respect to other aspects of the recall notification and mitigation plan in the US."[293]

225.    Royal Philips issued the following statement in a November 14, 2021 press release: "'In connection with the voluntary recall notification in June of this year, the FDA has recently conducted an inspection of a Philips Respironics manufacturing facility in the US,' said Frans van Houten, CEO of Royal Philips. 'We will work closely with the FDA to clarify and follow up on the inspectional findings and its recent requests related to comprehensive testing.'"[294]

226.    Royal Philips has also stated that it is involved in discussions with the Department of Justice relating to a Proposed Consent Decree. In its press release on Second Quarter 2022 results, Royal Philips said, "the US Department of Justice, acting on behalf of the FDA, recently began discussions with Philips regarding the terms of a proposed consent decree to resolve the identified issues [in inspection of U.S. facilities]."[295]

227.    Unfortunately, Philips' "recall" was a recall in name only. It did not effectively provide patients with notice of the risks of the Recalled Devices, nor did it provide them with new Philips CPAP, BiPAP, or ventilator devices.

        **1.**       **Many Patients, Providers, And Others Were Not Notified About The Recall.**

228.    On March 10, 2022, the FDA issued a Notification Order under § 518(a) of the FDCA.[296] The Notification Order stated that the "FDA has received a number of calls from patients

---

[293] Philips Press Release, "Philips starts repair and/or replacement program of first-generation DreamStation devices in the US and other markets" (Sept. 1, 2021) (footnote omitted).

[294] Royal Philips Press Release, "Philips provides update on earlier announced voluntary CPAP, BiPAP and Mechanical Ventilator recall notification*" (Nov. 14, 2021)

[295] Philips Second-Quarter Results 2022 (July 25, 2022)

[296] *See* 518(a) Notification Order, available at: https://www.fda.gov/media/156811/download (last accessed Oct. 3, 2022)

and consumers who contacted FDA to report problems and/or concerns regarding the Recalled Products, but were unaware of the recall and had not been informed of the health risks presented by the Recalled Devices."[297]

229.     The FDA estimated that, after nine months of the Recall, only "approximately 50% of patients and consumers who have purchased or received the Recalled Products (excluding ventilators) within the last five years (the service life of the devices) have registered with Philips to obtain a replacement device."[298] But it was "unclear whether the remaining patients and consumers have not registered because they are unaware of the need to register, or because they do not want or need a replacement device from Philips."[299]

230.     The FDA surveyed 182 consignees to determine whether they had been notified of the Recall and found 28 "who had reported to FDA that they were not aware of the recall."[300] The FDA reported its results to Philips on September 8, 2021 and October 29, 2021, but Philips did not promptly respond. Almost a month later, on November 22, 2021, Philips stated that it had notified 23 of the 28 consignees of the Recall, but Philips did not "indicate whether the consignees identified by FDA had been sent notification before, or only after, they had been identified by FDA as being unaware of the recall."[301] Moreover, Philips' evidence of notification consisted of delivery confirmation receipts, reflecting that written correspondence was delivered to the consignees. As the FDA explained, "[t]ypically, firms demonstrate the effectiveness of its recall

---

[297] *Id.* at 2.

[298] *Id.*

[299] *Id.*

[300] *Id.*

[301] *Id.*

communications through evidence more meaningful than a delivery confirmation receipt, such as a returned response form or a documented telephone conversation."[302]

231.    Throughout the Recall, the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient," and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[303]

232.    Noting "Philips' failure to timely provide effective notice to health professionals who prescribe or use the Recalled Products and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products," the FDA issued an order under Section 518(a) of the FDCA ordering Philips to give adequate notice.[304] Specifically, the FDA ordered Philips to "notify all health professionals who prescribe or use the Recalled Products, and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products **within the next 45 days**[.]"[305]

### 2.    Philips' Repair and Replacement Program Has Been Extremely Slow, Inadequate, and Ineffective.

233.    Those patients who registered their Recalled Devices with Philips for the Recall did not immediately receive replacement devices and were not told when a replacement device would be provided.

---

[302] *Id.* at 3.

[303] *Id.*

[304] *Id*. at 4.

[305] *Id.* (emphasis in original).

234.    As Philips' June 14, 2021 announcement explained:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.[306]

235.    In reality, patients may register their DreamStation Recalled Device with Philips for the Recall, but Philips has not immediately replaced the defective PE-PUR foam in the DreamStation Recalled Devices. Rather, patients have had to wait, sometimes for many months, for Philips to repair or replace their devices, and many patients are still waiting for a replacement device.

236.    As of the date of this Complaint—over a year after the Recall was announced—Philips continues to repair or replace defective DreamStation 1 Recalled Devices. In other words, the Recall remains ongoing.

---

[306] *See* Food and Drug Administration, Philips Issues a Recall Notification*, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam (last accessed Oct. 3, 2022).

237.     The replacement program for the Trilogy devices has been even slower. Philips has only just begun the rework of affected Trilogy 100/200 devices and Philips projects that the process will take approximately 12-14 months to complete.[307]

238.     There is no repair or replacement program for any of the other Recalled Devices recalled by Philips.

239.     Due to the design of the Recalled Devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves. Also, the FDA warns:

> Do **not** try to remove the foam from your device. Trying to or successfully removing the foam may damage the device or change how the device works. It may also lead to more foam or chemicals entering the air tubing of the device.[308]

240.     As a result, the Recall leaves patients without safe, free options. Instead, patients may simply be or were forced to buy Philips' next-generation product or a competitor's product—at full price, and indeed, thousands of patients, have already done so.

241.     Thus, Philips intends to, and is, profiting from its "recall" by selling more of its next generation product, the DreamStation 2, whose launch appears intentionally timed to coincide with the "recall."

242.     The FDA also believes that the Recall is not proceeding quickly enough. It recently stated:

> Based on the status of Philips' recall as of the date of this letter [May 2, 2022], CDRH believes that, if an order were to be issued to Philips under section 518(b), the plan submitted by Philips in response to that order should provide for significant improvements to Philips' ongoing repair and replacement activities to speed the pace of remediation and address other deficiencies identified by CDRH and

---

[307]     *See* Philips Respironics Update on Trilogy Remediation, https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/ventilation-news-and-updates (last accessed Oct. 3, 2022)

[308]     https://www.fda.gov/medical-devices/safety-communications/faqs-philips-respironics-ventilator-bipap-machine-and-cpap-machine-recalls (emphasis in original) (last accessed Oct. 3, 2022).

communicated to Philips, to the extent such improvements are achievable by Philips.[309]

## V.   CLASS ALLEGATIONS

243.   Plaintiff brings this action individually and as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3). Specifically, the Class consists of the following:

> **Nationwide Class:** All persons in the United States who paid for a Recalled Device but did not resell it.

244.   Plaintiff Gibbons seeks certification on behalf of a subclass defined as follows ("Delaware Subclass"):

> **Delaware Subclass:** All persons in Delaware who paid for a Recalled Device but did not resell it.

245.   Together, the Nationwide Class and the Subclass shall be collectively referred to herein as the "Class." Excluded from the Class are Defendants and their employees, officers, and directors; and the Judge(s) assigned to this case.

246.   Plaintiff reserves the right to adjust, modify, or narrow the Class prior to class certification.

247.   The rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform actions.

248.   This action has been brought and may be properly maintained as a class action for the following reasons:

a.   <u>Numerosity</u>: Members of the Class are so numerous that their individual joinder is impracticable. The proposed Class contains at least millions of individuals who purchased, otherwise acquired, or leased a Recalled Device. The Class is therefore sufficiently

---

[309] 518(b) Notice at 13.

numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown to Plaintiff at this time, but the Class members are readily ascertainable and can be identified by Defendants' records and records of third parties, such as durable medical equipment providers.

        b.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

        i.    Whether Defendants were unjustly enriched by the sale of Recalled Devices;

        ii.    Whether Defendants failed to warn consumers regarding the risks of the Recalled Devices;

        iii.    Whether the Recalled Devices suffer from a design defect;

        iv.    Whether Philips violated express or implied warranties in selling the Recalled Devices;

        v.    Whether Philips' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

        vi.    The appropriate nature of class-wide equitable relief;

        vii.    The appropriate measurement of restitution and/or measure of damages to Plaintiff and members of the Class;

        viii.    The appropriate measure of statutory damages; and

        ix.    Whether Plaintiff is entitled to punitive damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

        c.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of all members of the Class.

d.  <u>Adequacy</u>: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; he has retained counsel competent and highly experienced in complex class action litigation and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

e.  <u>Superiority</u>: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## VI.     <u>EQUITABLE TOLLING OF STATUTES OF LIMITATIONS</u>

249.     The running of any statute of limitations has been equitably tolled by Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff, the Class, and their physicians the true risks associated with the Recalled Devices.

250.     As a result of Defendants' actions, Plaintiff was unaware, and could not have reasonably known or learned through reasonable diligence, that be had been exposed to the risks

and harms set forth here and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

## VII.  CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
### On behalf of the Class

251.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

252.    Philips warranted that all of the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

253.    Philips breached its express warranty in connection with the sale and distribution of Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth here, rendering them unsuitable and unsafe for personal use.

254.    Had Plaintiff and the Class known the Recalled Devices were unsafe for use, they would not have purchased them.

255.    Philips has breached their warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

256.    To the extent privity may be required, Plaintiff and the Class can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity requirement. Plaintiff and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

257.     Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Philips sale of the Recalled Devices.

258.     Plaintiff is not required to give notice to Philips, a remote manufacturer and Philips has had notice of the type and source of claims in this matter for nearly a year.

259.     Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

260.     As a direct and proximate result of Philips' breach of its express warranty, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## On behalf of the Class

261.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

262.     By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiff and the Class that the Recalled Devices were of merchantable quality and safe for their ordinary and intended use.

263.     Such implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state.

264.     Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while

appearing normal, contained latent defects as set forth here rendering them unsuitable and unsafe for personal use.

265. Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth here rendering them unsuitable and unsafe for personal use.

266. Had Plaintiff and the Class known the Recalled Devices were unsafe for use, they would not have purchased or leased them.

267. To the extent privity may be required, Plaintiff and the Class can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity requirement. Plaintiff and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

268. Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Philips sale of the Recalled Devices.

269. Plaintiff is not required to give notice to Philips, a remote manufacturer and Philips has had notice of the type and source of claims in this matter for nearly a year.

270. Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

271. As a direct and proximate result of Philips' breach of the implied warranty of merchantability, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT III
## BREACH OF THE IMPLIED WARRANTY OF USABILITY

**On behalf of the Class**

272.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

273.     By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiff and the Class that the Recalled Devices were usable for their ordinary and intended use.

274.     Such implied warranty arises under U.C.C. § 2-314(3) as adopted in each state.

275.     Through usage of trade, manufacturers of prescription drugs and medical devices impliedly warrant that their products are usable for the end consumer.

276.     Philips breached the implied warranty of usability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices while appearing normal—contained defects as set forth herein rendering them unusable.

277.     Philips, its agents and employees knew or should have known that the Recalled Devices suffer from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

278.     Philips' Recall announcement instructed Class members to not use Recalled Devices because of the health risks. This renders the products unusable and thus worthless.

279.     Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Devices were usable for their ordinary and intended use.

280.     To the extent privity may be required, Plaintiff and the Class can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity

94

requirement. Plaintiff and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

281.    Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Philips sale of the Recalled Devices.

282.    Plaintiff is not required to give notice to Philips, a remote manufacturer and Philips has had notice of the type and source of claims in this matter for nearly a year.

283.    Had Plaintiff and Class members known they would not be able to use their Recalled Devices, they would not have purchased them or would have paid significantly less for them.

284.    As a direct and proximate result of Philips' breach of the implied warranty of usability, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

**COUNT IV**
**FAILURE TO WARN**
**On behalf of the Class**

285.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

286.    Defendants had a duty to warn Plaintiff and the Class members regarding the defect and true risks associated with the Recalled Devices.

287.    Defendants failed to provide adequate warnings regarding the risks of the PE-PUR foam.

288.    Defendants had information regarding the true risks but failed to warn Plaintiff, Class members, and their physicians to strengthen their warnings.

289.    Despite Defendants' obligation to unilaterally strengthen the warnings, Philips instead chose to actively conceal this knowledge.

290.     Plaintiff and the Class members would not have purchased, chosen, and/or paid for all or part of the Recalled Devices if they knew of the defect and the risks of purchasing the product.

291.     Defendants owed Plaintiff and Class Members a duty of care and to warn of any risks associated with the Recalled Devices. Defendants knew or should have known of the true risks but failed to warn Plaintiff, Class members, and their doctors.

292.     This defect proximately and Defendants' negligent breach of its duties caused Plaintiff's and Class members' injuries which include economic injuries, as well as headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

293.     Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT V
## DESIGN DEFECT
## On behalf of the Class

294.     Plaintiff reallege and incorporate by reference all preceding allegations as though fully set forth herein.

295.     Defendants negligently designed the Recalled Products. Philips owed Plaintiff and the Class a duty to design the Recalled Products in a reasonable manner.

296.     The design of the Recalled Products, including but not limited to design and use of the PE-PUR foam and the placement of the foam within the Recalled Products, was defective and unreasonably dangerous, causing degradation and inhalation of the PE-PUR foam, and causing headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

297.     The design of the Recalled Products and the PE-PUR foam rendered the Recalled

Products not reasonably fit, suitable, or safe for their intended purpose.

298.    The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are other CPAP and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions.

299.    Safer alternative machines were available that did not suffer from the defect as set forth herein and that did not have an unreasonable risk of harm as with the Recalled Products and their unsafe PE-PUR foam, for example machines made by other manufacturers.

300.    The risk benefit profile of the Recalled Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

301.    The Recalled Products did not perform as an ordinary consumer would expect.

302.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

**COUNT VI**
**COMMON LAW FRAUD**
**On Behalf of the Class**

303.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

304.    Philips knew that the Recalled Devices posed serious health risks to users.

305.    Philips failed to advise Plaintiff and the Class of the material fact that the Recalled Devices posed serious health risks to users. Philips concealed information regarding the adverse health effects posed by the Recalled Devices from Plaintiff and the Class members. Philips misrepresented to Plaintiff and the Class members that the Recalled Devices were safe for use.

306.    Philips was under a duty to disclose to Plaintiff and the Class members the serious health risks posed to users because: (a) Philips was in a superior position to Plaintiff and the Class members to know the risks associated with the use of the Recalled Devices; (b) Philips was in a

superior bargaining position to Plaintiff and the Class members in determining whether or not to disclose or conceal information regarding the Recalled Devices in its packaging, labels, advertising, and websites; (c) Philips made representations regarding the safety of the Recalled Devices and had a duty to fully disclose all facts related to the serious health risks to users posed by the Recalled Devices, once Philips became aware of such serious health risks; (d) Philips knew that the Plaintiff and the Class members could not reasonably have been expected to learn or discover the serious health risks posed by use of the Recalled Devices prior to purchasing the Recalled Devices, given the representations, concealed material information, and omissions by Philips in its packaging, labels, advertising, and websites; and (e) Philips has a duty to disclose information related to the health and safety of its products.

307.   Philips intentionally, knowingly, and recklessly allowed its packaging, labels, advertisements, promotional materials, and websites to mislead Plaintiff and the Class members to believe that the Recalled Devices were safe for use.

308.   Philips knew that its omissions, concealment, and representations in its packaging, labels, advertisements, promotional materials, and websites regarding the Recalled Devices were false, deceptive, inadequate, and misleading, and that the Recalled Devices contained PE-PUR Foam and thus could cause adverse health effects to users of the Recalled Devices.

309.   Philips concealed and misrepresented material information regarding the serious health risks posed to users of the Recalled Devices from Plaintiff and the Class members, by failing to include material information in its packaging, labels, advertisements, promotional materials, and websites.

310.   The information undisclosed and concealed by Philips to Plaintiff and the Class members were material, as a reasonable consumer would find information regarding serious

adverse health risks associated with the use of the Recalled Devices important when deciding whether to purchase the Recalled Devices.

311.    As a result of such deceptive packaging, labels, advertisements, promotional materials, and websites, Plaintiff and the Class members justifiably and reasonably believed the Recalled Devices were safe for use.

312.    Philips intentionally, knowingly, and recklessly made these material omissions and misrepresentations, and concealed material information regarding the adverse health risks associated with the Recalled Devices in its packaging, labels, advertisements, promotional materials, and websites regarding the Recalled Devices to induce Plaintiff and the Class members to purchase the Recalled Devices.

313.    Plaintiff and the Class members relied on Philips' deceptive packaging, labels, advertisements, promotional materials, and websites and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and promoted the Recalled Devices, such reliance by Plaintiff and the Class members was reasonable and justified.

314.    As a direct and proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiff and the Class members have suffered actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

## COUNT VII
## UNJUST ENRICHMENT (in the alternative)
## On behalf of the Class

315.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

316.    Plaintiff and Class members conferred a tangible and material economic benefit upon Philips by purchasing the Recalled Devices. Plaintiff and Class members would not have purchased or paid for the Recalled Devices had they known the true risks of using the Recalled Devices.

317.    Philips readily accepted and retained these benefits. Philips profited from the sale of the Recalled Devices to the detriment and expense of Plaintiff and Class members.

318.    Philips appreciated these benefits. These benefits were the expected result of Philips acting in its pecuniary interest at the expense of their customers. Philips knew of these benefits because Philips was aware of the defective nature of the Recalled Devices; Philips failed to disclose this knowledge, and thereby misled Plaintiff and Class members regarding the nature and quality of the Recalled Devices while profiting from this deception.

319.    Under these circumstances, it would be unjust, inequitable, and unconscionable for Philips to retain the economic benefits it received at the expense of Plaintiff and the Class, including because they were procured as a result of Philips' wrongful conduct alleged above. Failing to require Philips to provide remuneration under these circumstances would result in Philips being unjustly enriched at the expense of Plaintiff and Class members who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

320. Philips' retention of the benefits conferred upon it by Plaintiff and the Class would be unjust and inequitable.

321. Plaintiff is entitled to restitution of the benefits Philips unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with Philips, such amounts to be determined at trial.

322. Plaintiff pleads this claim separately as well as in the alternative to their other claims, as without such claims he would have no adequate legal remedy.

323. Plaintiff and the Class suffered damages in an amount to be determined at trial.

**COUNT VIII**
**MEDICAL MONITORING**
**<u>On behalf of the Class</u>**

324. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

325. At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

326. Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments.

327. When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious

injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

328.    The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

329.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG. TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts, and has been reported to cause Occupational Asthma. Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression. TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver. TDA and TDI are potential carcinogens. Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.

330.    As a direct and proximate result of Defendants' conduct, Plaintiff has been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

331.    As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering

further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

332.   Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

333.   Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiff, but the full extent of the injuries will not manifest until later in the Plaintiff's life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

334.   Plaintiff demands judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT IX**
**NEGLIGENT FAILURE TO RECALL/NEGLIGENT RECALL**
**On Behalf of the Class**

335.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein:

336.    Despite being aware of the Defect in the Recalled Devices as far back as 2008, Philips did not initiate a recall of the Recalled Devices until June 14, 2021.

337.    At all times relevant hereto, Philips manufactured, marketed, distributed, and sold the Recalled Devices.

338.    As set forth in detail above, as far back as 2008 (and in no event later than 2015), Philips knew or reasonably should have known that the Recalled Devices were defective and exposed users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam in the Recalled Devices.

339.    Despite that knowledge, Philips did not attempt to recall or retrofit the Recalled Devices prior to June 14, 2021, long after any reasonable manufacturer, distributor and/or seller under the same circumstances would have instituted a recall or retrofitted the Recalled Devices.

340.    Because of the delay in instituting a recall, Plaintiff continued to pay for and reimburse for the Recalled Devices when, without their knowledge, users were being exposed to substantial health risks.

341.    Had Philips instituted a recall when the risks to potential users of using the Recalled Devices were first made clear, Plaintiff would have not paid for or reimbursed for the defective devices and would have sought alternative methods to treat their breathing-related illnesses.

342.    Philips was aware that Plaintiff would make such a choice. That is why Philips waited until it announced the launch of the DreamStation 2, which does not contain PE-PUR foam, before it publicly disclosed that its previous generation of DreamStation products and other Recalled Devices posed serious health risks to users, and before Philips finally instituted a recall.

343.    Even after Philips finally announced it was instituting a voluntary recall of the Recalled Devices, it implemented the Recall negligently.

344.    Royal Philips took charge of and responsibility for the Recall. Royal Philips has interfaced with regulatory agencies in the U.S. and worldwide, but has not adequately notified users and their doctors about the recall or the options for obtaining a replacement device.

345.    First, when the Recall was announced on June 14, 2021, Philips did not adequately provide notice to users or their doctors about the risks of using the Recalled Devices, nor did Philips offer users of the Recalled Devices any option for a replacement device. In fact, the FDA issued a Notification Order to Philips under § 518(a) of the FDCA, documenting that the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient," and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[310].

346.    Then, when Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States, Philips estimated that it would take a year to complete the program. Philips was aware that this time frame was untenable for patients, many of whom relied on the machines to treat medical conditions.

347.    In addition, DreamStation customers were not given any specifics as to how the replacement program would work nor were they told when they might receive a replacement device (a significant factor for users who, again, relied on the machines for medical conditions) nor were their treating physicians given any meaningful guidance by Philips.

---

[310] 518(a) Notification Order.

348.  Still, the repair/replacement program only applied to affected DreamStation devices and did not impact any of the other Recalled Devices. Later, Philips instituted a repair program for the Trilogy devices, which has only just recently begun.

349.  Despite the estimated one-year timeline originally announced by Philips to replace recalled DreamStation devices, Philips has not performed the Recall according to its own projections, and many users are still waiting for repaired or replaced devices.

350.  In issuing a voluntary recall, Philips assumed duties to exercise reasonable care in issuing and implementing the Recall. Philips' conduct constitutes a breach of its duties by failing to adequately warn and notify users of the risks of using the Recalled Devices and failing to promptly replace the Recalled Devices.

351.  As a direct result of Philips' breach of duty, Plaintiff was damaged and continue to be damaged by having to stop using a Recalled Device that is a treatment for a health condition, pay money out of pocket to replace that Recalled Device, or continue using a defective Recalled Device.

352.  In addition, as a direct and proximate cause of Philips' breach of duty, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of continued exposure to the Foam Toxins.

353.  Plaintiff demands judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT X**
**Delaware Consumer Fraud Act**
**Del. Code Ann. tit. 6, § 2511, *et seq.***
**On Behalf of the Delaware Subclass**

354. Plaintiff Gibbons realleges and incorporates by reference all preceding allegations as though fully set forth herein.

355. Plaintiff Gibbons bring this cause of action individually and on behalf of the members of the Delaware Subclass.

356. The Delaware Consumer Fraud Act ("DCFA") was created to protect Delaware consumers from deceptive and unfair business practices.

357. Philips is a "person," and the Recalled Devices are "merchandise" as defined by the DCFA.

358. Plaintiff purchased or leased the Recalled Devices for personal purposes.

359. Philips marketed and advertised the Recalled Devices to consumers, physicians and other health care entities in Delaware. In addition, Philips, among other things, sold the Recalled Devices in Delaware, shipped Recalled Devices to Delaware, and otherwise conducted business related to the Recalled Devices in Delaware.

360. As set forth more fully above, Philips marketed and sold the Recalled Devices as machines that would help users breathe by, among other things, pumping air into users' lungs. While selling and profiting from the Recalled Devices, Philips knew that they were defective in that they posed significant risks of substantial physical injury to users who would potentially be inhaling toxic fumes as they used the machines due to the degradation and off-gassing of the PE-PUR foam. Philips intentionally concealed this material information from consumers, users, payors and health professionals because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat their breathing issues.

107

361.    Philips concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that the Recalled Devices were defective and would expose users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam. These material omissions were misleading and deceptive standing alone and were particularly deceptive in light of the fact that the Recalled Devices were sold as breathing assistance devices.

362.    Philips' conduct described herein constitutes the act, use or employment of conduct in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Delaware, which conduct created confusion or misunderstanding on the part of Plaintiff and Delaware Subclass members, making it unlawful under Del. Code Ann. tit. 6, § 2511, *et seq.*

363.    Philips' conduct constituted, among other things, the following prohibited fraudulent, deceptive, and unfair business practices: (a) misrepresenting that the Recalled Devices have characteristics, ingredients, uses, or benefits, which they do not have; (b) misrepresenting that the Recalled Devices are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) engaging in fraudulent and deceptive conduct that creates a likelihood of confusion and misunderstanding.

364.    Philips' conduct was fraudulent and deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive, reasonable consumers, including Plaintiff. Reasonable consumers, including Plaintiff, would have found it material to their purchasing decisions that the PE-PUR foam in the Recalled Devices posed a risk of degradation and off-gassing that would subject users to potential serious health consequences. Knowledge of those facts would have been a substantial factor in

Plaintiff's, as well as Delaware Subclass members', decision to purchase the Recalled Devices for personal purposes.

365.    Philips owed Plaintiff and Delaware Subclass members a duty to disclose these facts because they were known and/or accessible exclusively to Philips (along with PolyTech and potentially other unnamed parties who are not Plaintiff or Delaware Subclass members) who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Philips actively concealed them; because Philips intended for consumers to rely on the omissions in question; and because the Recalled Devices pose an unreasonable risk of substantial bodily injury.

366.    Plaintiff and members of the Delaware Subclass reasonably and justifiably relied on the omissions by Philips, and reasonable consumers would have been expected to rely upon these omissions.

367.    Philips' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiff (as set forth above) and members of the Delaware Subclass. Absent Defendants' unfair and fraudulent conduct, Plaintiff and Delaware Subclass members would have behaved differently and would not have purchased or leased the Recalled Devices. Philips' omissions induced Plaintiff and Delaware Subclass members to purchase or lease Recalled Devices they would not otherwise have purchased or leased.

368.    Accordingly, pursuant to Del. Code Ann. tit. 6, § 2511, *et seq*., Plaintiff and Delaware Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: the difference between the values of the Recalled Devices as represented (their prices paid) and their actual values at the time of purchase ($0.00), or the cost to replace the Recalled

Devices; and other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Delaware Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests, individually and on behalf of the Class and Delaware Subclass, that this Court:

A.　determine that the claims alleged herein may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and Subclasses defined above, and designate Plaintiff as the class and the Delaware Subclass representative as specified above and Plaintiff's counsel as counsel for the Nationwide Class and Delaware Subclass;

B.　award equitable relief, including but not limited to, requiring Philips to provide restitution and disgorgement of profits;

C.　award all damages to which Plaintiff and Class members are entitled;

D.　award pre-judgment and post-judgment interest on such monetary relief;

E.　award reasonable attorneys' fees and costs; and

F.　grant such further and other relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff and the Class and Delaware Subclass demand a trial by jury on all issues so triable.

Dated: October 8, 2022

Respectfully submitted,

*/s/ Sandra L. Duggan*
Sandra L. Duggan, Esquire
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite500
Philadelphia, PA 19106
T (215) 592-1500
sduggan@lfsblaw.com

*/s/ Kelly K. Iverson*
Kelly K. Iverson, Esquire
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 152222
T (412) 322-9243
kelly@lcllp.com

*/s/ Christopher A. Seeger*
Christopher A. Seeger, Esquire
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
T (973) 639-9100
cseeger@seegerweiss.com

*/s/ Steven A. Schwartz*
Steven A. Schwartz, Esquire
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
T (610) 642-8500
steveschwartz@chimicles.com

*Plaintiffs' Co-Lead Counsel*

*/s/ D. Aaron Rihn*
D. Aaron Rihn, Esquire
**ROBERT PIERCE & ASSOCIATES, P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 (phone)
(412) 281-4229 (fax)
arihn@peircelaw.com

Peter St. Tienne Wolff, Esquire
**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**
One Oxford Centre - 38th Floor
Pittsburgh, PA 15219
(412) 263-2000 (phone)
(412) 263-2001 (fax)
psw@pietragallo.com

*Plaintiffs' Co-Liaison Counsel*

Joseph P. Guglielmo
Amanda M. Rolon
**Scott+Scott Attorneys at Law LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
jguglielmo@scott-scott.com
arolon@scott-scott.com